(No. 43409.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HECTOR PAGAN, Appellant.

*Opinion filed May 22, 1972.—Rehearing denied September 29, 1972.*

JULIUS LUCIUS ECHELES and WILLIAM E. LASKO, II, both of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ROBERT A. NOVELLE and NICHOLAS D. TAUBERT, Assistant State's Attorneys, of counsel), for appellee.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

In a bench trial in the circuit court of Cook County, the defendant, Hector Pagan, was found guilty of the murder of Frank Cmiel and sentenced to a term of 25 to 40 years in the penitentiary. He appeals from that conviction alleging various errors.

On Saturday, February 15, 1969, at about 4:00 P.M., the decedent, Frank Cmiel, and five other young persons

were walking along a street in Chicago when a black Cadillac containing about six people pulled up. All four doors flew open, and one of the occupants jumped out with a gun in his hand. Someone said: "We'll get you 'Fish' "—"Fish" being the nickname of one of the decedent's companions. The decedent and his friends started to run. As they were running, a shot was fired which struck and killed Cmiel.

Shortly after the incident, the decedent's companions told the police that the person with the gun had a goatee and a moustache. On the following day, February 16, the defendant voluntarily turned himself in to the police in Aurora, Illinois. He was taken to Chicago and agreed to appear in a lineup. Four of the persons who had witnessed the incident the previous day were present at the lineup, and each of them identified the defendant as the person he had seen at the scene of the shooting with a gun in his hand. At the lineup the defendant was clean-shaven.

Four of the decedent's five companions testified at the trial, and each of them made courtroom identifications of the defendant. They testified that after the defendant jumped out of the car and before they turned and started to run, they were able to observe the defendant for a brief period of time. They each saw a gun in his hand and noted that he had a goatee and a moustache. The occurrence witnesses also testified that they had either seen or talked to the defendant on previous occasions.

The defendant denied shooting Cmiel and presented an alibi defense. Several witnesses, including the defendant's brother, his step-father and a barber testified that the defendant was in Aurora on February 15 at or near the time the shooting occurred and that he did not have a goatee or a moustache on that date. Testifying in his own behalf, the defendant stated that he had not been in Chicago at any time on the day Cmiel was killed. On cross-examination, he said that at one time he had a goatee but that he had shaved it off before Christmas.

During the People's case in chief, Detective Frank Bertucci testified that subsequent to the lineup on Sunday, February 16, the defendant made a statement that he had shaved off his moustache and goatee on the preceding morning, *i.e.*, the morning of the day that Frank Cmiel was shot. This statement was in conflict with the defendant's subsequent testimony to the effect that he had been clean shaven for approximately 1½ months prior to the occurrence. On this appeal, the defendant urges that his statement to Officer Bertucci should not have been admitted into evidence, since he was not given adequate *Miranda* warnings of his right to appointed counsel prior to questioning. This contention cannot be sustained. During the trial, Officer William Lenz testified that he was present with Detective Bertucci and the defendant at the time Bertucci warned defendant of his rights. Officer Lenz testified as follows:

"Detective Bertucci advised him that he did not have to say anything at this time. And secondly advised him that if he did say anything that it could and would be used against him at a future date in a court of law. He thirdly advised him that he had a right to have an attorney present at any time that he was being questioned and at this time.

He fourth advised him that if he did not have the money to obtain counsel that free counsel would be provided for him by the state and that he had a right to have this counsel present at any time that he was being questioned. He asked him if he understood and Mr. Pagan indicated that he did understand.

Mr. Pagan said that he had nothing to hide and knew nothing about the shooting. He was then asked about a beard or a moustache and he told us that he did have a beard but he had shaved it off on Saturday morning."

Detective Frank Bertucci testified that he warned defendant as follows:

> "I told Mr. Pagan, 'You have the right to remain silent. Do you understand that?' He replied 'Yes,' he did. I then told him that anything he said could and would be used against him in a court of law. I asked him if he understood that. He replied that he did.
>
> I then told him he had the right to have an attorney present during any and all questioning and asked if he understood that. He again replied that he did. I also told him that if he could not afford an attorney, one would be appointed to defend him by the court and asked him if he understood that. He replied that he did.
>
> I then told him that we would like to have him stand in a show up and I advised him again of his constitutional rights, also telling him that he had a right to have an attorney present during any and all show ups or lineups conducted."

In our opinion, there was sufficient uncontroverted evidence before the trial court to sustain a conclusion that the defendant had been sufficiently apprised of his right to an attorney, either retained or appointed, prior to any questioning.

Defendant raises a similar contention with respect to the lineup. Relying on decisions of the United States Supreme Court in *United States v. Wade (1967), 388 U.S. 218, 18 L.Ed.2d 1149, 87 S.Ct. 1926; Gilbert v. California (1967), 388 U.S. 263, 18 L.Ed.2d 1178, 87 S.Ct. 1951;* and *Coleman v. Alabama (1970), 399 U.S. 1, 26 L.Ed.2d 387, 90 S.Ct. 1999,* defendant argues that he was entitled to assistance of counsel at the lineup and that he was not sufficiently advised of his right to have counsel appointed for him prior to the lineup if he could not afford to hire his own attorney. Again, we believe the record amply indicates that the defendant was sufficiently informed that

he could have the assistance of appointed counsel prior to questioning and during the lineup. The record establishes that despite such warnings, the defendant voluntarily chose to participate in the lineup without the assistance of counsel, and waived any right to counsel under circumstances indicating that such waiver was knowingly and voluntarily made.

As previously noted, all of the State's occurrence witnesses made courtroom identifications of the defendant. Defendant contends that the identification testimony of three of those witnesses—Bobby Gaytan, Clyde Bobnock and Joe Lochirco—resulted from unnecessarily suggestive pretrial identification procedures. On the date of the shooting, and apparently again the next day prior to the lineup, Bobby Gaytan viewed two photographs shown to him by the police and selected one of them which showed the defendant without a goatee or moustache. Bobnock was also shown pictures (an undetermined number), and he also identified one as that of defendant. The record contains no other details as to the circumstances under which the photographs were exhibited to the two witnesses. During the lineup itself, Gaytan, Bobnock and Lochirco separately viewed a lineup of three men which did not include the defendant. Each witness indicated that no person in that lineup was the assailant. Subsequently, each witness separately viewed a four-man lineup which contained the three persons previously viewed plus the defendant. Each witness identified the defendant as the person he had seen with a gun in his hand at the scene of the shooting the previous day.

Although the pretrial identification procedures may not have been perfect in all respects, we are of the opinion that on the facts of this case the defendant has not met his burden of establishing that the pretrial events were so suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *(Simmons v. United States (1968), 390 U.S. 377, 19 L.Ed.2d 1247, 88 S.Ct. 967;*

*Stovall v. Denno (1967), 388 U.S. 293, 18 L.Ed.2d 1199, 87 S.Ct. 1967; People v. Eubank (1970), 46 Ill.2d 383; People v. McMath (1970), 45 Ill.2d 33; People v. Watkins (1970), 46 Ill.2d 273; People v. Johnson (1970), 45 Ill.2d 38; People v. Nelson (1968), 40 Ill.2d 146.)* Of particular significance is the fact that each of the identification witnesses had some acquaintance with the defendant prior to the shooting. Gaytan testified that he had seen the defendant on several occasions, the most recent having been about two weeks prior to the incident. Bobnock had talked to the defendant about a month before the shooting and had been struck by the defendant at that time during an incident involving the defendant and Joe Lochirco. Lochirco also testified as to his acquaintance with the defendant and the confrontation he had with him in the presence of Bobnock a month prior to Cmiel's death. The defendant himself corroborated Bobnock's and Lochirco's testimony in this regard. It is thus clear that the defendant was no stranger to the three witnesses prior to their brief observation of him at the scene of the shooting.

We have given due consideration to selected portions of Bobnock's and Gaytan's testimony on cross-examination which defendant relies on to support his contention that their lineup identifications of him were in fact unduly influenced by a photograph shown to them at the police station. While it is apparent that Bobnock did not entirely understand some of the questions asked of him on cross-examination, the substance of his testimony was simply that the picture he saw at the police station refreshed his recollection of what happened at the incident. This is understandable. Although Gaytan testified that the picture he saw at the police station may have helped him a "little" in his subsequent lineup identification of the defendant, he too exhibited lack of understanding as to the meaning of defense counsel's questions on cross-examination as can be seen from the following excerpts from the record:

"Q. Did this picture help you in any way to refresh your memory as to what Dino looked like?

A. The picture that I looked at?

Q. Did that help you in any way?

A. What do you mean?

Q. Did they help you to refresh your recollection as to what Dino looked like? Did it help your memory of Dino?

A. The picture?

Q. Yes.

A. Yes.

Q. They did help you. Was your identification at the lineup based on the help furnished by these pictures?

A. Yes.

Q. It wasn't entirely based on the incident itself, is that right?

MR. EGAN: Objection, Judge.

THE COURT: Overruled.

THE WITNESS: Will you repeat that?

MR. PERDOMO: Would the court reporter repeat the question. (Question read by the reporter as follows: "It wasn't entirely based on the incident itself, is that right?")

THE WITNESS: I don't know what you mean.

THE COURT: The identification, that is what you are referring to, is that correct?

MR. PERDOMO: Yes, your Honor.

THE COURT: Do you understand the question? Ask another question.

MR. PERDOMO: Q. Was the identification based both on the incident and the picture?

A. Yes.

MR. PERDOMO: Q. Did the picture help you a lot or just a little bit?

MR. EGAN: Objection, asked and answered.

THE COURT: Overruled.

THE WITNESS: Would you repeat that.

MR. PERDOMO: Q. Did the picture help you a lot or just a little in identifying the individual in question?

A. Little.

Q. Little?

A. Yes."

A fair reading of the record leads us to conclude that the courtroom identifications of the defendant were substantially independent of any improper influence arising from the pretrial identification proceedings. *People v. Robinson (1969), 42 Ill.2d 371; People v. Nelson (1968), 40 Ill.2d 146.*

We next turn to defendant's closely related argument that the identification testimony of the occurrence witnesses was insufficient to establish his guilt beyond a reasonable doubt. It is undisputed that these witnesses were able to observe the defendant at the scene of the crime for only a matter of seconds. The defendant has also pointed out some inconsistencies, uncertainties and contradictions in some of the testimony. For example, when Bobnock was cross-examined as to whether or not he had any trouble identifying the picture of the defendant at the police station, he indicated that he wasn't sure the first time and had to take a second look. On recross-examintion when he ·was asked if he hesitated to identify the defendant when he first saw him in the lineup, he answered: "A little." When Lochirco was asked on cross-examination if right after the incident he had any doubt as to the identity of the assailant, he replied: "There was one." Also, amidst some confusion during cross-examination, he first testified that the only person he saw get out of the car had black hair but did not have a goatee or a moustache. Subsequently, he contradicted himself and stated that the man he saw get out of the car with black

hair had a goatee and a moustache. In view of these matters, it is very apparent that this was a case in which the credibility of the witnesses and the weight of their testimony was of critical importance. In the absence of a jury, it was within the province of the trial court to determine the credibility and weight of the testimony, to resolve the inconsistencies and conflicts therein, and to render its decision accordingly. Since the trial court had an opportunity to observe the witnesses, its judgment on these matters should not be set aside on review unless the proof of guilt is so unsatisfactory as to create a reasonable doubt as to the defendant's guilt. *(People v. Guido (1962), 25 Ill.2d 204; People v. Crenshaw (1959), 15 Ill.2d 458.)* We do not find the proof so unsatisfactory as to require reversal in this case. After careful review of the record in its entirety, we are of the opinion that there was sufficient evidence to support the trial court's finding that the defendant's guilt had been established beyond a reasonable doubt.

The defendant also assigns as error the court's limitation of his cross-examination and recross-examination of certain of the People's witnesses. His primary contention in this regard is that the court did not permit recross-examination of Joe Lochirco as to whether he still had doubts that the defendant was the assailant. As previously indicated in this opinion, Lochirco made an in-court identification of the defendant as the assailant but on cross-examination stated that immediately after the incident he had "one" doubt. On redirect examination, the State's Attorney unsuccessfully attempted to reopen the question of identification:

"Q. As the defendant Hector Pagan, Dino, sits here today, is this the same man that you saw get out of that car?

MR. PERDOMO: I object. It's been asked and answered and it's improper on redirect.

THE COURT: Sustained.

Immediately thereafter on recross-examination, the defendant attempted to raise the same matter:

Q. You stated, Joe, that you had some doubt after the incident. Are there any doubts lingering in your mind?

MR. EGAN: Objection, Judge.

THE COURT: Sustained."

In our opinion, the effect of this latter ruling was to properly limit the defendant from reopening the question of identification which he had himself just prevented the People from going into on redirect examination. For the same reasons we find no error in the court's limitation of defendant's attempted recross-examination of Robert Gaytan concerning the defendant's appearance two weeks prior to the date of Cmiel's death. Again, the defendant attempted to reopen a matter on recross-examination which he had just previously objected to and foreclosed on redirect. In both instances, the court properly limited recross-examination to matters which had been brought out on redirect examination.

The defendant also contends that "the court limited cross-examination concerning possible hostility against defendant by witness Bobnock." The transcript reveals the following:

"Q. Have you ever had any problem with the police?

A. With the police?

Q. Yes.

A. A little.

Q. Have you ever been convicted?

MR. EGAN: Objection, Judge.

MR. PERDOMO: This is his witness, your Honor.

THE COURT: There is a proper way of approaching that.

MR. PERDOMO: The evidence is not available to me your Honor. The police records are not available to me.

THE COURT: Sustained."

If defense counsel was attempting to impeach the witness, the trial court was clearly correct in sustaining the objection on the grounds that it was not being approached properly. From the subsequent line of questioning which followed, however, we assume that the purpose of the objected-to question was to show that Bobnock would have been hostile toward the defendant if his previously testified-to altercation with the defendant had resulted in his being convicted of a crime. In response to the court's suggestion that there was a proper way of approaching the matter, defense counsel rephrased the question and elicited testimony from Bobnock that no arrests had resulted from that prior incident. Under these circumstances, the defendant obviously was not prejudiced by the court's ruling which he now complains of.

In an attempt to rebut defendant's alibi testimony that he was not in Chicago on February 15, 1969, the People called Peter Miloradovic as a rebuttal witness. Miloradovic testified that on some Saturday morning in February, 1969, the defendant and two others assaulted him and then went into a store where they started "beating up everybody in the store." Defendant argues that the admission of such testimony was clearly erroneous, since the witness could not recall the date, although he did testify that it was on the same day that he heard shooting in the neighborhood. He further contends that in any event Miloradovic's testimony should have been limited to the fact that he saw defendant in Chicago and that it was highly prejudicial to permit him to go beyond that in relating details of the defendant's alleged other criminal activity.

An examination of the record reveals that the court sustained the defendant's objection to the admission of

Miloradovic's testimony as to the alleged "other crimes." In responding to defendant's objection the court stated that it "would sustain the objection on the basis that a proper foundation has not been laid as to date, time, place and who was present. And then we'll see whether or not it's subject to any objection. So the answer of this witness may be stricken at this time." It is readily apparent that the People never were able to establish that the events Miloradovic testified to occurred on February 15, 1969, and we must presume that the complained-of prejudicial testimony concerning "other crimes" remained stricken from the record and was not considered by the court. In bench trials, such as this, it may be presumed that the trial judge considered only competent and relevant evidence. *(People v. Mays (1971), 48 Ill.2d 164.)* The record contains nothing to indicate that this presumption should not prevail in the case before us *(cf. People v. Nuccio (1969), 43 Ill.2d 375),* and defendant's contentions with respect to Miloradovic's testimony can not be sustained.

One of the five eyewitnesses to the shooting, Michael Soriano, did not testify at the trial. On recross-examination, the defendant inquired as to the reason for Soriano's absence at the trial. On redirect examination, the court, over defendant's objection, permitted Detective Bertucci to testify that Soriano's mother would not permit her son to testify because he had been threatened and beaten up and she was in fear of his life. On appeal, the defendant argues that Bertucci's hearsay testimony explaining Soriano's absence was improperly admitted and was highly prejudicial to the defendant in that it suggested that Soriano had been threatened and beaten up on defendant's behalf, thereby demonstrating a consciousness of guilt on the part of the defendant. We believe it was perfectly proper for the People to explain Soriano's absence in order to rebut the inference that the testimony of an uncalled witness is presumed to be adverse to the State's case. *(People v. Johnson (1970), 45 Ill.2d 38; People v. Guido*

*(1962), 25 Ill.2d 204.)* However, we agree with the defendant's contention that the objected-to testimony here in question was clearly hearsay and should not have been admitted. Nevertheless, as we recently noted in *People v. Mays (1971), 48 Ill.2d 164, 167,* "absent the circumstance of evidence being received by the court which is so prejudicial as to clearly deny the defendant a fair trial, an error in the admission of evidence in a trial before the court, rather than before a jury, does not constitute reversible error. The trial judge is presumed to have considered only the competent and relevant evidence." There is no indication in the record that the trial court considered the testimony as having any bearing on the subject of the defendant's guilt or innocence, and we do not believe that the admission of such testimony was so highly prejudicial as to deprive defendant of a fair trial under the facts of this case.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*