THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROGER TOLEFREE *et al.,* Defendants-Appellants.

(No. 54715; ▮▮▮▮▮▮▮

First District (2nd Division)—September 25, 1973.

James J. Doherty, Public Defender, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago, for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

Indictment No. 69-2689 charged Roger Tolefree and James Williams with the crime of armed robbery in violation of section 18—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1967, ch. 38, sec. 18—2). After a trial before a jury, both defendants were found guilty. Tolefree, who was free on pretrial bond on another unrelated robbery indictment at the time of the commission of the instant offense, was sentenced to a term of not less than five nor more than twenty years in the penitentiary. Williams, who had prior felony convictions for armed robbery, rape, and unlawful use of weapons, was sentenced to a term of not less than eight nor more than twenty years. Both defendants appeal.

At around 1:00 A.M. on the morning of 13 June 1969, a tan 1962 or 1963 Chevrolet automobile with a blue door on the driver's side pulled

into a Clark service station at 5200 S. Western Avenue in Chicago. The man sitting in the front passenger seat of the automobile asked the attendant, Harry Kapitanek, to check the oil. As the attendant was doing so, the same man, who was wearing a dark slipover jacket and was later identified as defendant Tolefree, approached the attendant with a small revolver in his hand. Tolefree ordered the attendant into the station and called to the driver of the vehicle. The driver was wearing a gold shirt and was later identified as defendant Williams. Williams was armed with a .45 caliber pistol. Inside the station, the two assailants took the attendant's money, money belt, and money changer. Before they left, Tolefree hit the attendant over the head with his weapon, injuring him, but not rendering him unconscious. As the assailants were leaving, they picked up a number of cartons of Kool cigarettes. A subsequent inventory showed that seven cartons had been taken.

The police were summoned to the service station shortly after the robbery. Upon their arrival, the attendant gave them a detailed description of the automobile used by the assailants and of the items taken in the robbery, but described the assailants themselves merely as "two coloreds". Thereafter, one of the police cars was dispatched to take the attendant to a hospital to receive treatment for his scalp wound.

At approximately 1:40 A.M., a police officer driving a police patrol car observed a tan Chevrolet with a blue door on the driver's side run a stop light at 22nd and Kedzie. The vehicle was proceeding north on Kedzie. The officer pursued the vehicle and, while he was doing so, he received a radio communication describing the vehicle involving in the robbery. The officer called for assistance, and with the help of two other squad cars succeeded in stopping the fleeing vehicle. The occupants were ordered out of their car, after which the officer saw a .45 caliber automatic and a .22 caliber revolver on the front seat. The .45 caliber was closer to the driver's side while the .22 was closer to the passenger's side. On the back seat were approximately seven cartons of Kool cigarettes together with a coin changer on a belt. The driver of the car was defendant Williams, and the passenger, defendant Tolefree.

As the service station attendant was being driven to the hospital, he was asked over the police car radio whether he was able to come to the police station first. He said that he was. Upon arriving at the police station, and while he was still outside, the attendant saw police officers take two men into the station. He could see only that the arrested men were two "coloreds", but could not see who they were. He admitted that he overheard a police officer say that the two were suspects in his case. After the police decided that there would be some delay in arranging a lineup, the attendant was taken to the hospital for treatment.

· After having received six stitches in his head and some medication, the attendant was returned to the police station at about 2:30 A.M. Upon his return to the police station, the attendant gave a description of he clothing worn by his two assailants, and told where each man was seated in the automobile and which man held which weapon. Thereafter, he was taken to view a lineup of four black men, from among whom he immediately identified Tolefree and Williams.

Defendant Tolefree, testifying in his own behalf, stated that he had been at a pool hall until shortly before 1:00 A.M. on the morning of 13 June 1969. After leaving the hall, he found a dice game in a hallway a few doors from the pool hall. The game had gone on for a short time when the players were joined by two men not known to Tolefree, but known to others in the group as "Big Red" and "Henry". Tolefree stated that he had won the cartons of cigarettes and the money changer from those two men in the dice game. Tolefree then testified that Big Red told him where he might sell the cigarettes at that hour and loaned him his (Big Red's) car to go there.

While on the way to the suggested location, Tolefree testified that he saw defendant Williams leaving an elevated train station. He asked Williams if he would like a ride and if he (Williams) would like to drive the car. Shortly thereafter, they were stopped by the police. Tolefree testified that, as Williams applied the brakes, the two guns slid from under the front seat of the car. They picked up the guns, laid them on the seat, and then obeyed the police order to get out of the car.

OPINION

Defendants' first contention is that their in-court identification was tainted by a suggestive lineup. They argue that the victim of the robbery (the service station attendant) was unable initially, to describe his assailants to the police. Defendants predicate this argument on the victim's testimony that he did not initially give to the police a detailed physical description of the two assailants. They further argue that the lineup was tainted because the victim may have seen the defendants at or in the police station before the lineup.

■■ The burden is upon the defendants to establish that the circumstances attending the lineup were so suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*People v. Pagan* (1972), 52 Ill.2d 525, 288 N.E.2d 102; *People v. Brown* (1972), 52 Ill.2d 94, 285 N.E.2d 1.) We cannot say from an examination of this record that this burden has been sustained.

■■ The record does not show that the victim was *unable* to describe the assailants, but rather that he was not asked to do so at the time of the initial interview with the police, at the service station. Because the

assailants had left the scene of the crime in a tan automobile with the distinctive characteristic of a blue door on the driver's side, the police may well have believed, at that point, that a quick location of the automobile would be more likely to result in the arrest of the offenders than would their physical description. Another factor is that the victim was bleeding from his head wound. The police may well have thought that, since they had such a detailed description of the assailants' car, a detailed description of the assailants could wait until after the victim had received medical attention. Later, at the police station, the victim described the clothing worn by the assailants, the seat location of each person within the car, which one held the .45 automatic, and which one held the small caliber revolver. It is clear that the victim had an adequate opportunity to observe defendants at the service station prior to and independent of the lineup, which opportunity was itself sufficient to support the victim's in-court identification of defendants. (See, *People v. Hayes* (1972), 52 Ill.2d 170, 287 N.E.2d 465; *People v. Catlett* (1971), 48 Ill.2d 56, 268 N.E.2d 378.)

We find no merit in defendants' argument that the lineup was impermissibly tainted because the witness may have seen defendants at or in the police station before the lineup. On cross-examination, the victim testified that, while he was outside the police station, he saw the police bring in two persons and overheard a police officer say that the two were suspects in his case. The victim, however, could not see who those two persons were. He could only see that they were two "coloreds". Such a coincidental observation, if indeed those persons were the defendants, is not so likely to taint the witness' lineup identification or to demonstrate a police effort toward creating a suggestive lineup procedure as to call for reversal. (*People v. Canale* (1972), 52 Ill.2d 107, 285 N.E.2d 133.) The victim immediately identified the two defendants from among the four black men in the lineup.

Defendants next contend that the prosecutor's closing arguments were prejudicial in two instances. The first alleged impropriety was in the following statements of the prosecutor:

> "Now you heard the defendant take the stand, * * *, and he said he won these articles in a dice game at 12:40 that evening from some fellow named Big Red and a fellow by the name of Henry who never appeared. * * * Big Red? Who is he? I don't know. I don't know if anyone knows."

Relying solely upon the case of *People v. Smith* (1969), 105 Ill.App.2d 8, 245 N.E.2d 23, defendants argue that these comments were prejudicial.

But the holding in *Smith* constituted a sub-exception to an exception. It is the exception which applies to the instant case, because there are

no circumstances here which are comparable to those which produced the sub-exception in *Smith*.

In *Smith*, the defendant was charged with armed robbery and was convicted in a jury trial. The defendant testified in his own behalf and stated that on the day of the robbery he had been ill at his home, where he had been visited by two nurses, his girl friend, and other friends. None of the alleged visitors testified.

During the State's first closing argument to the jury, the prosecutor commented on the absence of witnesses and stated that the power of subpoena was available to the defense. He then said:

"They had all the opportunity * * * to bring those people in with subpoenas * * *. They are not here for one very simple reason, it just didn't happen that way, and they are not going to get up on that stand and perjure themselves for Mr. Smith or anyone else."

During the State's second closing argument to the jury, another prosecutor said:

"* * * the defendant testified that these people were very good friends of his, lived in the same building * * * all had ample jobs * * *. Where are these people who have ample jobs? Why weren't they subpoenaed from their place of employment? Where are the nurses? Where are they? * * * Why don't they come? They don't want to lie for the defendant? Or is it that the defendant's testimony is not true? What do you think about it?"

The court, *inter alia*, held that it was error for both prosecutors to make the remarks they did about the absent witnesses.

"Seven subpoenas had been issued at the defendant's request; six were returned unserved and the one witness who had been served did not appear. The record indicates that the prosecutors knew this, and their statements about the defendant's not using the power of subpoenas were unjustifiable. Also, their remarks that the witnesses did not come to court because they did not want to commit perjury were unfair. This implied either that the witnesses had been asked to testify and had refused or they had not been asked because the defendant knew that their testimony would contradict his. Both implications carry a covert suggestion that the defendant was guilty of the robbery because the witnesses did not testify in his behalf."

The court then continued:

"The general rule is that a defendant has no obligation to call witnesses and his not doing so raises no presumption of law that if

called they would have testified unfavorably to him. *People v. Munday,* 280 Ill. 32, 117 N.E. 286 (1917). See also *People v. Smith,* 74 Ill.App.2d 458, 221 N.E.2d 68 (1966).

When the defense is an alibi, this court has recognized an exception to the general rule. We have held that it is not improper for the State to comment upon the failure of a defendant to produce witnesses to support his testimony that he was in their company at the time of the alleged crime. *People v. Sanford,* 100 Ill.App.2d 101, 241 N.E.2d 485 (1968); *People v. Gray,* 52 Ill.App.2d 177, 201 N.E.2d 756 (1964). In the present case, however, the prosecutors' remarks went far beyond mere comment and were one of the two errors which deprived the defendant of a fair trial."

*Smith* is readily distinguishable from the case at bar. No similar misleading and prejudicial statements were made by the prosecutor in this case. The record does not indicate that the prosecutor knew of any effort to locate the alleged witnesses, much less subpoena them, until a motion had been made by defendants for a continuance for the purpose of securing the alibi witnesses, first on the day the trial began and again at the close of all the evidence. To permit the defense to avoid the alibi exception, by the use of the last minute motions for a continuance would be to establish a purely formal sub-exception which would swallow the exception. For a recent case applying the alibi exception set *People v. Arnold* (1973), 12 Ill.App.3d 826, 299 N.E.2d 446.

Moreover, we think *People v. Swift* (1926), 319 Ill. 359, 150 N.E. 263, is applicable to the instant case. In that case, the defendant was charged with robbery. Defendant testified in his own behalf and stated that, at all material times, he had been at the house of a woman whom he did not know and whom he had met on the street, and that he did not know where the house was located except that it was about a block from Main Street. In his closing argument to the jury, the prosecutor commented on the fact that the defendant had no witnesses to support his defense of alibi. The court paraphrased the comment as follows:

"The language objected to was to the effect that if [the defendant] had been at the places where he said he was at the time of the commission of the offense there would be witnesses available to support his story."

In holding that the prosecutor's remarks were not improper, the court said:

"The rule is that a defendant is not bound to produce any witnesses, and where he does not testify to any attempt on his part to secure witnesses or as to his failure to secure them, it is error to comment on his failure to do so. (*People v. Langzem,* 307 Ill. 56.)"

The court then summarized the alibi testimony of the defendant and continued:

> "The purpose of this evidence evidently was to account for his failure to produce the woman referred to, and his testimony in that regard was a proper subject of comment on the part of counsel representing the State, and counsel's remarks do not come within the rule referred to."

In the instant case, defendant Tolefree testified in his own behalf that, in a dice game, he had won the cartons of cigarettes and the money changer from two persons whom he did not know but who were known to others in the game as "Big Red" and "Henry". As in *Swift*, the purpose of this testimony, in part, was to account for his failure to produce either man, so that, in the words of the *Swift* opinion,

> "His testimony in that regard was a proper subject of comment on the part of counsel representing the State, and counsel's remarks do not come within the rule referred to."

Finally, we are aware that, in *People v. Nilsson* (1970), 44 Ill.2d 244, 248, 255 N.E.2d 432, 434, our Supreme Court said that the case authority in Illinois is conflicting on the question of whether a prosecutor's reference, in his closing argument to the jury, to defendant's failure to support his alibi with the testimony of alleged alibi witnesses is improper. But the court then held that, even assuming that such comment was improper, it would not constitute reversible error in that case because it would not result in substantial prejudice to the defendant (citing *People v. Stahl*, 26 Ill.2d 403, 406; *People v. Swets*, 24 Ill.2d 418, 423; *People v. Berry*, 18 Ill.2d 453, 458). In the instant case, while we hold that the prosecutor's comment was not improper, we also hold that, even if it were, the impropriety did not result in substantial prejudice to defendant and therefore did not constitute reversible error.

The second alleged impropriety in the final argument was in the following statement:

> "Then (defense counsel) kept going on asking about fingerprints, whose fingerprints would have been found on this stuff * * *. Well that is the kind of a red herring that is thrown into this case."

This statement was made in response to defense counsel's having pointed out that police, in investigating, had made no effort to obtain corroborative fingerprint evidence.

We note that no objection to this statement was raised at the trial. The error, if any, may therefore be deemed to have been waived. *People v. Weaver* (1972), 7 Ill.App.3d 1104, 288 N.E.2d 669; *People v. Donald* (1963), 29 Ill.2d 283, 194 N.E.2d 227.

This court might nevertheless consider the question if the state-

ment were so prejudicial as to constitute plain error under Supreme Court Rule 615. But we do not view the use of the term "red herring" in the context of this final argument as amounting to an accusation that defense counsel was trying to free his clients by the use of trickery. The defense had vigorously argued before the jury that doubt had been cast upon the positive identification of defendants by the fact that the police did not search for corroborative fingerprints. The prosecution responded by saying that defendants had admitted handling the guns and contraband, so that fingerprints would add nothing to what they had already admitted. It was in this context that the term "red herring" was used to characterize the defense argument. While the volunteered characterization would better have been left unsaid, it falls far short of the express accusations of trickery condemned in *People v. Freedman* (1954), 4 Ill.2d 414, 123 N.E.2d 317, and *People v. Savage* (1934), 358 Ill. 518, 193 N.E. 470, both of which were cited by defendants. We conclude that the above quoted statements were not so prejudicial as to constitute plain error under Rule 615.

Finally, defendant Tolefree argues that the trial court committed error at the hearing in aggravation and mitigation by considering the fact that he was at liberty on bond on a previous robbery charge at the time of the robbery for which he had just been convicted.

It should first be noted that that information was disclosed by the State only after defense counsel in mitigation had stated that Roger Tolefree had "never been convicted of a misdemeanor, never even been arrested for a felony." The correction of a misstatement made by the defense concerning an issue raised by the defense is not error. *People v. Hayes* (1962), 23 Ill.2d 527, 179 N.E.2d 660.

██ Furthermore, the courts of this State indulge a presumption that the trial court has recognized and disregarded incompetent evidence at the pre-sentencing hearing unless the record affirmatively discloses the contrary. (*People v. Fuca* (1969), 43 Ill.2d 182, 251 N.E.2d 239.) During the hearing in aggravation and mitigation, the trial court referred to the fact that Tolefree was on bond at the time of his offense, but in the sentencing decision he said, "I do have to take into consideration your age * * *, and the fact that you havn't been convicted of anything other than the $100.00 fine." Even if we were to ignore the context of the correction of the defense misstatement and were to view the information that defendant was on bond at the time of the commission of the instant crime as having been improperly introduced into the hearing in aggravation and mitigation, we cannot say that the record in this case is strong enough to overcome the presumption against the use of incompetent evidence by the trial court. The language of the trial court quoted above

indicates a clear sensitivity to the need to draw a line between arrests and convictions.

Furthermore, we are not persuaded that the information at issue here must be excluded from the sentencing decision. In a recent decision, defendant complained that an incorrect reference to a pending indictment for burglary had been made at the hearing in aggravation and mitigation in that the State described him as having sexually assaulted the burglary victim. The Illinois Supreme Court observed that "we have repeatedly held that proof of a pending indictment is properly presentable in aggravation as are a wide variety of other factors (*People v. Spicer,* 47 Ill.2d 114), and the trial court is presumed to recognize incompetent evidence and disregard it. (*People v. Fuca,* 43 Ill.2d 182)." *People v. Bey* (1972), 51 Ill.2d 262, 267, 281 N.E.2d 638, 641. The gravamen of the aggravation involved here in the case of defendant Tolefree is not merely that he was subject to a pending indictment for another crime of the very same nature as that for which he was convicted herein, but rather that his commission of the crime for which he was convicted herein involved his betrayal of the trust accorded him by society when he was released from custody on the pre-trial bond. In our opinion, this breach of trust is a special aggravating factor which is clearly relevant to the sentencing decision.

For the foregoing reasons, the convictions of Tolefree and Williams are affirmed.

Affirmed.

STAMOS, P. J., and LEIGHTON, J., concur.