THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HOWARD D. WHITE, JR., Defendant-Appellant.

First District (5th Division)   No. 77-1861

Opinion filed December 29, 1978.—Supplemental opinion filed on denial of rehearing April 12, 1979.

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Defendant was charged by indictment with seven counts arising from an abortion he allegedly performed on Manon Broomfield. (Ill. Rev. Stat. 1973, ch. 38, pars. 81—13(g), 12—4(a), 12—4(a), 12—4(a), ch. 91, pars. 16j, 16k, 16q.) Following a bench trial, he was convicted on the criminal abortion count (Ill. Rev. Stat. 1973, ch. 38, par. 81—13(g)) and sentenced to one to three years in prison. On appeal defendant contends that the criminal abortion statute under which he was convicted is unconstitutional and that he was not proven guilty beyond a reasonable doubt. We affirm.

### State's Case

At trial, Vita Broomfield (Vita) testified that she was the mother of Manon Broomfield (Manon), the complainant. On April 15, 1975, she took

her daughter to the Midwest Clinic at 316 North Michigan Avenue for the purpose of having an abortion performed on Manon. When they arrived, Vita paid the receptionist and Manon left her mother's presence. An hour later she returned without having had an abortion. Vita had a conversation at the clinic with a counselor named Valerie who subsequently called her on the telephone several times over the next three days. All but $30 of Vita's money was returned to her.

At noon, on April 18, 1975, she took Manon to the Northeast Clinic at 1200 North Dearborn for an appointment. No one was there, so she went downstairs, called Valerie, and returned to the clinic. At approximately 12:45 p.m., defendant arrived, stating he had just come from the hospital, and Vita assumed he was a doctor.

They entered the clinic and Vita and defendant went to the examining room while Manon remained in the waiting room. He gave her insurance papers and she paid him $250. Defendant told her that they could come back the next day, a Saturday, but Vita wanted the abortion done immediately because the following day her husband would be at home. Defendant told her that the abortion was not legal.

Subsequently defendant and Manon went into his office and closed the door. Vita did not see her daughter again until 3:30 p.m. At that time, Manon was in the examining room and appeared very ill and pale. There was blood all around her. Defendant told Vita that he might have to send her daughter to the hospital, and that Manon's blood pressure was low. He directed her to go to the drugstore to pick up some medicine, and that he would order the prescription over the phone. However, he did not have the prescription filled. Defendant then told Vita that Dr. Stewart would take care of Manon in the hospital.

Subsequently, Manon got dressed and defendant's receptionist and Vita helped Manon to the elevator. In the elevator, Manon fainted. When she recovered, the receptionist accompanied Manon and her mother to the hospital. After their arrival at the hospital, Vita did not see Manon again until 8 p.m. when she went to Manon's room and Manon was being examined by defendant and Dr. Stewart. Manon was screaming during the examination.

The following day Vita learned that Dr. Stewart would no longer be Manon's doctor and Dr. Fiakpuis would take over. On Monday evening she and her husband went to the hospital, spoke with Dr. Fiakpuis and signed a consent form for an operation to be performed on Manon the following morning.

During cross-examination, Vita testified that on April 15, 1975, she believed that Manon was pregnant. The previous day she had taken Manon to Billings Hospital but to her knowledge, her daughter was not examined. She did not leave Manon at Billings Hospital because the

abortion procedure would have taken too long. At Billings, they gave her the address of the North Michigan Avenue Clinic, where she subsequently took Manon. Vita had also considered taking Manon to Detroit for an abortion.

Vita further testified that during the previous January and February, she noticed that Manon had been gaining weight, but Manon insisted that she was having her menstrual period every month between January and April. Manon finally admitted to her that she had been lying because she was afraid. Vita had not told her husband of their daughter's pregnancy because she did not want to disappoint him.

Vita also stated that it was at defendant's suggestion, that his receptionist accompany her and her daughter to the hospital. Vita did not tell the admitting personnel why Manon was being admitted nor did she recall being asked. Although the hospital form bears the notation "incomplete abortion," she did not impart that information. After Manon was admitted, Vita met a doctor from India who was wearing a turban, and she lied to him, saying that Manon had been having intermittent abdominal pains and vaginal bleeding since that morning. Vita further testified that Valerie did not tell her that defendant could arrange to get her daughter into a hospital and keep quiet the fact that she was having an abortion. She also admitted during cross that there is a civil suit pending against defendant and others on Manon's behalf.

On redirect, Vita stated that she gave incorrect information to the Indian doctor because she was under the impression from defendant that the abortion was illegal. Defendant had told her that she would not have to give any information at the hospital. During recross, Vita said that she lied to the doctor even though she thought her daughter would die.

Dr. Hilbert Stewart testified that he is a licensed physician and surgeon affiliated with Illinois Central Hospital. He knew defendant for a number of years, had met him socially a few times and thought that he was an osteopath. Dr. Stewart explained that an osteopath is a combined medical doctor and chiropractor and that some osteopaths perform surgery and prescribe drugs.

On April 18, 1975, Dr. Stewart spoke to defendant on the telephone. Defendant told him that he had a patient in his office that had had a "surgical procedure" concerning the "generative organs," and that the child was in a "compromised position." Stewart could not specifically remember what defendant said he had done. He did recall defendant stating that the patient was having an abortion or had had an abortion and that she was in shock.

Defendant asked him to arrange hospitalization and Stewart did so and became the treating physician on a temporary basis. On the same day, defendant introduced him to the mother of the patient. He treated

Manon until the 20th of April and diagnosed that she possibly had some sort of perforation of her uterus. He may have thought at the time that she was aborted. During cross-examination, Stewart testified that he did not believe that defendant said that he performed the abortion.

Dr. Everett Fiakpuis testified that he is licensed to practice medicine and perform surgery. On April 21, 1975, he examined Manon upon the request of Dr. Stewart. He observed that her abdomen was soft and she was experiencing some tenderness. Her genitalia were within normal limits, and her cervix was closed. Her uterus was soft, slightly tender and enlarged to about ten to twelve gestational sizes. That is, the appearance of her uterus was one of a woman who is 10 to 12 weeks pregnant.

Defendant called him several times between April 21 and April 23, 1975. On April 22, Fiakpuis performed surgery on Manon. He performed an "exploratory laborotomy" where he discovered a ragged perforation in Manon's uterus and "necratic, foul-smelling products of conception adhering to the endometrium." The whole of the anterior cervix of the uterus was discolored. Fiakpuis was of the opinion that the tear in the uterus was probably caused by an instrument. He performed a total abdominal hysterectomy on Manon.

During cross-examination, Fiakpuis could not say what kind of instrument caused the tear. He could not say that a corkscrew instrument made the hole. During redirect, he stated if a corkscrew were long enough, it could have caused the hole and during redirect, he stated that the tear was located 8 to 10 inches from the opening.

William Mavrelis, the director of pathology and clinical pathology at Illinois Central Hospital testified that he examined the uterus after it was surgically removed from Manon Broomfield. He found that it had an unusual tear that could have been made by an instrument that was used from the inside out. There was hemorrhaging into the uterine cavity and into the wall of the uterus. He diagnosed it as a pregnant uterus with perforations and "endo cervicitis or erosive cervicitis." Because of the removal of her uterus, Manon will not be able to produce children. During cross-examination Mavrelis stated that there were pus cells that could have caused the patient harm and possibly her life.

Manon Broomfield, the complainant, testified that she was 18 years old at the time of trial. In April of 1975, she thought she was pregnant because she had missed about three menstrual periods. On April 15, 1975, she went with her mother to a clinic at 316 North Michigan where she was examined by a doctor. At approximately 12:30 p.m. on April 18, 1975, she went to a clinic at 1200 North Dearborn and defendant arrived 45 minutes later.

At the clinic, she went into an examination room, put on a gown, laid

down on the examination table and put her feet into stirrups. She had not been bleeding or in pain prior to this time. Defendant brought his tools over to the table. He first inserted a vagina widener into her. She had read about this instrument in a medical guide. He then gave her a pain shot in the vagina. Subsequently he took a pair of long manicuring scissors and inserted them into her vagina and began "cutting or pushing against something." She felt "like water rushing out," and defendant wiped the table with a rag. He then picked up a 6- to 7-inch-long tool that looked like a corkscrew, inserted it and began twisting it. This procedure lasted from 45 minutes to an hour. He asked her whether she felt pain and then gave her another pain shot. He took what looked like the same corkscrew and inserted it again for a second 45-minute period. She felt water dripping again and he cleaned off the table and put the matter into a dish which he subsequently poured down the drain. The dish was filled with blood and blood clots. Defendant then gave her a sanitary pad.

Defendant came to see her at the hospital and called her three times on the telephone. On the phone, he told her he was sorry and offered to start a trust fund for her. He said that he did not want to go to jail because he had just started his practice. His receptionist brought her flowers.

During cross-examination, Manon admitted that she failed to or would not tell her mother that she had missed her period. At the Loop Clinic she was told that she was more than 12 weeks pregnant. She did not recall whether she told anyone at the hospital that defendant had used a corkscrew. She was aware of the pending lawsuit against defendant but did not know anything about it.

On redirect, Manon stated that the doctor at the Loop Medical Center examined her with his hands and did not use any instrument. She was able to observe the device defendant used in his office, because she lifted her head to watch.

The State read into the record the contents of a certified court proceeding which reflected that defendant had two previous convictions in 1966 and 1970.

## Defendant's Case

Defendant testified in his own behalf that in April 1975, he was licensed to practice chiropractic medicine but is no longer so licensed. He was practicing at the Northeast Clinic at 1200 North Dearborn. At 2:35 p.m. on April 18, 1975, he received a phone call from Valerie McCullough. One half hour later, Manon and Vita Broomfield arrived at the Clinic, as arranged by McCullough, where he was waiting for them.

He gave them a confidential patient introductory form to fill out. He subsequently took Manon to the examining room, gave her a gown to

change into, and left. When he returned she was a little pale, slightly shaking and appeared to be in "some sort of distress." When he began examining her she started to perspire so he took her temperature and found her temperature to be slightly elevated. He took her blood pressure and found it to be slightly low. Her pulse was very rapid and not very strong. He observed that she was wearing a large sanitary napkin which she bled through. He asked her to remove it, and when she did, a large blood clot came out.

With his hands, he palpated her uterus, which he was allowed to do under his license, and found her uterus to be swollen. He then used a vaginal speculum which was also an activity authorized under his license, and noticed that the cervix had dilated and had a bluish discoloration. He asked Manon how long she had been having this problem and she responded that it had started that morning. She had been to see a friend of her mother's, a doctor, "but she didn't want to get involved." Defendant placed a fresh sanitary napkin on her. He noticed that Manon appeared faint and when he again took her blood pressure, he found that it had fallen considerably.

He then went into the waiting room where Vita was and told her that her daughter had said she had been to see someone else and that she was suffering from an acute loss of blood and was going into shock. He told Vita that he would call over a prescription to the drugstore and asked her to pick up the medicine. She left and he helped Manon get dressed. She was shaky and still bleeding. He called the drugstore and told them to send Vita back. He then telephoned Dr. Stewart and did not tell him that he had performed surgery.

When Vita returned, defendant told her that he had arranged to send Manon to the hospital. Since she had indicated on the form that she did not have insurance, he told her she would need a cash deposit. At that time, she stated that she did have insurance. She said that her husband would "kill both of us" if he finds out. Defendant responded that the safety of her daughter was her first concern. He then called Stewart and told him that they had insurance. He asked his receptionist who was also his sister to accompany them to the hospital.

Defendant further testified that he did not use a corkscrew or even have such an instrument at his office. He did not do any of the things that Manon described and used only a sponge forceps to clean out the vaginal vault so he could observe her cervix, a procedure which was within the scope of his license. He assumed that she was threatening to have a spontaneous abortion and thought that she probably had had a partial incomplete abortion performed by someone else. He went to her hospital room that evening but never called her or offered to set up a trust fund.

Vita Broomfield paid him $25 in cash. He never told her that he would see what he could do about an abortion and never told her what he was doing was not legal. He denied telling her to lie to people at the hospital, nor did he tell his sister to bring Manon flowers.

During cross-examination, defendant testified that he diagnoses pregnancies and was prepared to do so for Manon. He diagnoses pregnancies by manual examination and at other times, by urine tests. There was some blood on his table during Manon's exam which he wiped off with a paper towel. Her bag of water did not rupture in his office. He did not tell Stewart that an abortion had been performed on Manon. Defendant further testified that 25 minutes passed between the two times he took Manon's blood pressure. He assumed her blood pressure fell because of the bleeding. McCullough had only once before sent over a patient to him.

On redirect, defendant stated that he had in the past, referred patients to other doctors to have them hospitalized and would follow up by visiting them. Upon examination by the court, defendant stated that he automatically gave youngsters pelvic examinations. The Broomfields did not know whether he was an M.D. or a chiropractor. Vita told him that Manon was having cramps and pain in her abdomen. He had never called the pharmacy before that day but thought that they would accommodate him in an emergency. It was also the first time that he had referred a patient to Dr. Stewart.

Upon further redirect, defendant stated that three weeks before, McCullough had tried to sell him a tax shelter, and that he had seen her two or three times before. Upon further examination by the court, defendant stated that if a patient has gestated long enough, one can determine whether her ambiotic (sic) sac is filled with fluid.

STATE'S CASE IN REBUTTAL

Manon testified that no other person used an instrument on any part of her body. On cross, she testified that the first time her blood pressure was taken by defendant she was lying down and the second time, she was sitting up.

Dr. Antonio Scommegna testified as an expert in obstetrics and gynecology. The State posed a hypothetical question concerning the fluctuations in blood pressure as described by defendant and he responded that such fluctuations were possible. Likely causes for the drop in blood pressure would be from hemorrhage or a vaginal reaction due to "donatation." The reaction would take place if the cervix of a woman who had not previously had a child were dilated by an instrument. Removal of a blood clot attached to a sanitary napkin would not cause the

drop in blood pressure. Furthermore, if the bleeding were significant a vaginal reaction is unlikely. The blood pressure of the patient could go back up by placing her in a reclining position.

On cross-examination the doctor said that the sudden drop in blood pressure could be caused by internal or external bleeding and that a cursory examination could miss internal bleeding. He also stated that if there was a tear in the uterus there may be significant bleeding to account for the drop in blood pressure.

The doctor was also asked a hypothetical question concerning the effect of the insertion and twisting of a 6-7 inch corkscrew type instrument. He stated that such an instrument could not remove the contents of the uterus but would do a great deal of damage to the integrity of the uterine wall. On redirect, the doctor stated that this instrument could tear the uterus.

The State's last witness was Valerie McCullough who testified that she is an independent contractor for the Chicago Loop Medical Clinic and runs a counseling service for women who wish to obtain abortions. On April 15, 1975, McCullough had a conversation with Vita Broomfield in the presence of Manon. Subsequently she telephoned defendant. She had met defendant the previous December and had his business card. She told him that she had a hysterical patient who had an "A.B." and asked him if he knew someone who could put the patient in the hospital. He responded that he would see what he could do. She spoke to him the next day and he told her he could arrange to put Manon in an osteopathic hospital and to send her to him. In another phone conversation, McCullough told defendant that Manon only had four hours for the procedure. He responded that if it were her first trimester, she could be taken care of within that amount of time; if her pregnancy was beyond the first trimester, she would have to stay. He also directed her to send the Broomfields to him on the 18th of April. During this same time period, McCullough spoke to Vita approximately three times on the phone.

During cross-examination, McCullough testified that she knew that defendant was a chiropractor, and had not, prior to April 18, 1975, referred anyone to him for the purposes of an abortion. In her conversations with him regarding Manon Broomfield, he did not say that he would perform one. The State then stipulated to the fact that McCullough had received immunity from prosecution for her testimony before the grand jury, except that she was not immune from prosecution for perjury.

Upon examination by the court, MCullough stated that she had tried to sell defendant a tax shelter, but he did not purchase one. Both Manon and her mother were in tears when she met them. The cost of the abortion was to be $250 unless it was necessary for Manon to become an in-patient.

During cross-examination, McCullough testified that defendant may have said that he would examine Manon to determine the period of her pregnancy.

OPINION

The threshold issue before us is whether the provision in the criminal abortion statute under which defendant was convicted is unconstitutional.

Section 3 of the Illinois Abortion Law (Ill. Rev. Stat. 1973, ch. 38, par. 81—13(g)) defines "criminal abortion" as follows:

"* * * the use of any instrument, medicine, drug or other substance, whatever, with the intent to procure a miscarriage of any woman except when done by a physician in conformity with this Act. It shall not be necessary in order to commit a criminal abortion that the woman be pregnant, or if pregnant, that a miscarriage be accomplished."

■■ Defendant contends that the recent Federal district court opinion in *Wynn v. Scott* (N.D. Ill. 1978), 449 F. Supp. 1302, appeal pending *sub nom.* Carey v. Wynn, No. 78 229, appeal filed August 9, 1978, compels a holding in this case that the provision in issue is unconstitutional. We disagree.

In *Wynn,* plaintiffs in the two consolidated class action cases involved were four male physicians, two women who were pregnant at the time of the action, two not-for-profit corporations which perform abortion services and one physician who regularly performs abortions. One of the issues involved concerned the constitutionality of the portion of the 1975 Illinois statute defining criminal abortion, which was identical, in wording, to the 1973 provision involved in the instant case. Plaintiffs challenged the provision on due process grounds because of vagueness and because it punished unintentional conduct. The court found:

"The absence of a definition of 'miscarriage' in the definition of criminal abortion gives rise to a true vagueness problem. Because this critical term is not defined, *physicians* cannot tell what conduct is prohibited." (Emphasis added.) 449 F. Supp. 1302, 1328.

Having so reasoned, the court later concluded:

"[W]e declare the following portions of the Illinois Abortion Act void and unenforceable because they conflict with rights guaranteed plaintiffs by the due process clause of the Fourteenth Amendment to the Constitution of the United States: §2(6), the definition of criminal abortion; * * *." 449 F. Supp. 1302, 1331.

At the outset, we note that the court in *Wynn* found the statute unconstitutional as to plaintiffs because as physicians, they would not know what conduct was proscribed by the use of the word "miscarriage." Therefore they stood to be punished for unintentional conduct. The

defect existing in *Wynn* is not present in the case at bar. Defendant is not being punished for unintentional conduct; he is being punished for an intent that is quite clear. The statute clearly indicates that such a procedure should not be done "except when done by a physician in conformity with this Act." Section 4 of the Illinois Abortion Law (Ill. Rev. Stat. 1973, ch. 38, par. 81—14) describes with particularity who may perform an abortion, when, where, and under what conditions:

"(a) During the first trimester an abortion shall be performed by a *physician;*

(b) During the second trimester or thereafter, an abortion shall be performed by a physician, in a hospital, on an inpatient basis, with measures for life support which must be available and utilized if there is any clearly visible evidence of viability;

(c) During the third trimester, an abortion shall only be performed to preserve the life or to preserve the physical or mental health of the mother by a *physician* after consultation with at least two other *physicians* not related to or engaged in practice with the attending *physician.*" (Emphasis added.)

Further, section 3 of the Illinois Abortion Law (Ill. Rev. Stat. 1973, ch. 38, par. 81—13(d)) defines physician as "a person licensed to practice medicine in all its branches under the Illinois 'Medical Practices Act.' " Clearly, defendant, a chiropractor who by definition is not a physician, knew his undertaking to be proscribed under the provisions of the Act. We need not even consider as was necessary in *Wynn*, whether the term "miscarriage" is vague as to him, a nonphysician.

Having determined that the statute in issue is constitutional as applied to defendant in this case, we next turn to defendant's contention that the State failed to prove him guilty beyond a reasonable doubt of this charge.

The testimony offered by the State and defendant clash in almost every respect as to the actions of defendant, the understanding of Vita, and the condition of Manon from the time the Broomfields arrived at defendant's clinic through the time of Manon's hospital stay. The only crucial point they do agree upon is that someone performed an abortion upon Manon Broomfield.

■■ It is well established that in a bench trial, the determination of credibility and the weight to be given testimony, are matters within the province of the trier of fact, since he has the superior opportunity to observe the witnesses. (*People v. Pagan* (1972), 52 Ill. 2d 525, 288 N.E.2d 102; *People v. Jones* (1976), 42 Ill. App. 3d 353, 356 N.E.2d 114.) We, as a reviewing court, are unwilling to disturb his finding, unless the proof of guilt is so unsatisfactory as to create a reasonable doubt. (*People v. Pagan* (1972), 52 Ill. 2d 525, 288 N.E.2d 102; *People v. Novotny* (1968), 41 Ill. 2d

401, 244 N.E.2d 182.) The testimony of even one witness, if positive and credible is sufficient to convict, even though it is contradicted by the accused. (*People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182; *People v. Jones* (1976), 42 Ill. App. 3d 353, 356 N.E.2d 114.) Finally, we are unwilling to reverse a conviction solely on the ground that the trial court chose to believe the State's witnesses, rather than those of the defense. *People v. Gomez* (1963), 29 Ill. 2d 432, 194 N.E.2d 299; *People v. Fulton* (1967), 84 Ill. App. 2d 280, 228 N.E.2d 203, *cert. denied* (1968), 390 U.S. 953, 19 L. Ed. 2d 1145, 88 S. Ct. 1045.

■■ Defendant points to certain factors which he contends illustrate that both Broomfield women were unworthy of belief. Vita Broomfield tried to conceal from her husband the fact of their daughter's pregnancy. Further she failed to tell the Indian doctor that Manon had undergone an abortion and instead lied about her condition, even though she thought Manon's life was in danger. Manon lied to her mother about her pregnancy for several months. Without commenting on the wisdom of either Vita's or Manon's actions, we do not find that these factors seriously taint their testimony so as to raise a reasonable doubt of guilt. The trial judge considered these factors, as well as the fact of the civil lawsuit pending against defendant on behalf of Manon, in determining the weight to be given their testimony.

Defendant also urges that the medical testimony completely contradicted Manon's account of the procedure she underwent in defendant's office, and corroborated his. We disagree.

Dr. Fiakpuis, who performed the hysterectomy, testified that the tear in Manon's uterus occurred 8-10 inches from the vaginal opening while Manon testified that the corkscrew device was 6-7 inches long. The trial court apparently decided that this discrepancy need not be given great weight and we concur since Fiakpuis did testify that it was possible for a corkscrew to have caused the tear. Defendant also points to the testimony of the expert, Dr. Scommegna, that if a corkscrew instrument had been used, it would damage the uterine wall but would not remove the fetus. Although the pathologist, Dr. Mavrelis, did not testify whether or not there were portions of the fetus remaining, the doctor who performed the hysterectomy testified that there were "necratic, foul smelling products of conception adhering to the endometrium."

■■ We find parallels between the instant case and *People v. Fulton* (1967), 84 Ill. App. 2d 280, 228 N.E.2d 203, *cert. denied* (1968), 390 U.S. 953, 19 L. Ed. 2d 1145, 88 S. Ct. 1945. In *Fulton*, defendant contended that he was not proven guilty of criminal abortion beyond a reasonable doubt, where his version of events contradicted that of the State's witnesses. In that case, complainant testified that she went to the store of defendant, a pharmacist, and while there he inserted a tube in her uterus and packed it

with cotton. She said that the procedure took about 10 minutes and she paid defendant $100. The person who accompanied complainant to the store for a prearranged meeting, testified that she saw complainant go into a back room with defendant and return 15 minutes later. The witness heard defendant tell complainant to leave the packing in for a certain period of time and complainant paid him money. A doctor corroborated the fact that an abortion had been performed. Defendant testified that he was led to believe complainant needed publicity on his radio show, and he set up an audition for her. He said that complainant was nauseous and used his bathroom for 5-10 minutes. He denied inserting a rubber tube in her or accepting $100 from her. His medical witness further testified that it was impossible to induce a rubber tube into the vagina unless a speculum was used. In *Fulton,* the court found, as we do here, that there was considerable corroborating testimony that the complainant, accompanied by a witness went to defendant for the purpose of procuring an abortion, which was accomplished, and money was paid for his services. See also *People v. Gomez* (1963), 29 Ill. 2d 432, 194 N.E.2d 299.

For the foregoing reasons, we find the abortion statute constitutional as applied to defendant, and that he was proven guilty beyond a reasonable doubt of performing a criminal abortion. Consequently, we affirm the judgment of the trial court.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.


SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

Mr. JUSTICE WILSON delivered the opinion of the court:

In his petition for rehearing, defendant asks us to reconsider our holding that the 1973 Abortion Control Act did not apply to him and to consider the question of when his sentence should commence. Although we find defendant's arguments with regards to the first issue lacking in merit, we will consider the second issue because, subsequent to hearing oral arguments, we entered an order that this issue would be taken with the case.

A brief history is necessary to understand the sentencing question. On February 21, 1977, defendant was convicted of criminal abortion in an Illinois State court and on May 23, he was sentenced to serve a term of one to three years. Defendant filed a timely appeal and was permitted to remain at liberty pending appeal after posting a bond. On April 14, 1978, he was convicted in an Illinois Federal district court for his violations of various Federal drug and firearm statutes on or about July 22, 1977. He

was sentenced to two concurrent terms of 10 to 15 years and a separate 5-year term to run concurrently with the first two sentences; he arrived at the Leavenworth Federal Penitentiary to begin his imprisonment on July 6, 1978. On July 31, we issued an order revoking defendant's appeal bond.

Defendant contends that his Illinois sentence began no later than July 31, when we revoked his appeal bond. He argues that our order of revocation amounts to a judicial decree committing him to the Illinois Department of Corrections. We disagree.

■ If we were to agree with defendant's argument that our order of revocation amounts to a judicial decree which starts his imprisonment on the criminal abortion offense, we would be ruling, in effect, that the sentence for that offense would run concurrently with the sentences for the Federal offenses. This we cannot do since it is the prerogative of the court issuing the second sentence to determine the effect of the already imposed sentence. (*People ex rel. Fleming v. Pate* (1971), 48 Ill. 2d 426, 270 N.E.2d 4; *People v. Clark* (1977), 46 Ill. App. 3d 240, 360 N.E.2d 1160.) This rule applies whether the court issuing the second sentence is another state's court (*People v. Clark*) or a Federal court. (*People ex rel. Fleming.*) Furthermore, when two sentences have been issued, the first by a State court and the second by a Federal court, there is a presumption that the sentences run consecutively unless the order of the Federal court expressly states otherwise. *People ex rel. Fleming; People v. Boney* (1970), 128 Ill. App. 2d 170, 262 N.E.2d 766.

In the instant case, there is no indication that the Federal court's order states that the sentences are to run concurrently. Absent such an express statement, we conclude that defendant's Illinois' sentence does not begin until the completion of his Federal sentence.

The petition for a rehearing is accordingly denied.

SULLIVAN, P. J., and MEJDA, J., concur.