THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOSE TORRES *et al.*, Defendants-Appellants.

First District (3rd Division)    Nos. 79-668, 79-669 cons.

Opinion filed September 30, 1981.

Glen E. Gutsche, of Chicago, for appellant Jose Torres.

Sheldon L. Banks, of Chicago, for appellant Miguel Trinidad.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Mark A. Graf, Assistant State's Attorneys, of counsel), for the People.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:

Jose Torres and Miguel Trinidad, the defendants, were charged by indictment with attempt murder and aggravated battery. At a bench trial they were convicted of reckless conduct and were sentenced to 364 days imprisonment.

The defendants raise the following issues on appeal: (1) whether they were convicted of reckless conduct beyond a reasonable doubt; (2) whether the trial court erred in denying a motion to suppress identification testimony; and (3) whether the sentences imposed upon them were excessive.

At trial, Marie Barmes testified that at 7:30 p.m. on October 10, 1976, when she was 12 years old, she was outside of her home at 5200 South Bishop with Ann Marie Zellinski, Brian Zellinski and Mary Skwarczyk. Bishop Street was a southbound one-way street. Marie was standing with Mary on 52d Street near the north side of the house. Ann Marie and Brian were playing on the grass on 52d Street near Bishop. As Marie was writing her name on the side of her house, she observed a yellow Nova automobile on 52d Street coming towards her. She noticed the car for a few

seconds and last saw it as it approached the curb at the corner of 52d Street and Bishop. While she continued to write her name, she heard a firecracker-like noise, felt a tingling sensation in her legs and saw blood. Marie was taken to the hospital and a bullet was removed from her right leg.

Marie was unable to identify her assailants and could not state how many people were in the car. It was dark outside at the time of the incident.

Ann Marie Zellinski, who was also 12 years old at the time of the incident, testified that when Marie was shot, she was wrestling with her brother by the Barmes house on the grass outside the sidewalk near the street. Ann Marie was about two to four feet from Bishop Street and two feet from 52d Street. It was dark outside at this time. Ann Marie first noticed a yellow or lime colored Nova travelling eastbound on 52d Street when it was seven feet from her. She knew the car was a Nova because her friends, John Sternquist and Clayton Sims, drove Novas.

Ann Marie further testified that it took approximately two minutes for the car to travel the two blocks and to turn south in front of the Barmes house. For 10 seconds, as the car passed by her, she observed two male Puerto Ricans or Latinos who she identified as the defendants. The car stayed in front of the house for 30 seconds with the passenger side nearest to the curb. While the car was parked, Ann Marie heard a firecracker-like noise. She looked at Marie and then at the car. The passenger in the car had his arms out of the front window holding a black colored gun. Ann Marie identified the gun at trial and said she was two to four feet from the car when she saw the gun. She could not say where each of the defendants were sitting in the front seat of the car and could not say who fired the gun.

Ann Marie testified that, after the shooting, she heard laughter and conversation, in a language she did not understand, coming from the car. After Marie fell to the ground, the car pulled away rapidly from the curb, and travelled south on Bishop and east on 53d Street. About two minutes later, the police arrived.

Ann Marie stated that she could not give the police a description of the assailants' clothing or their facial characteristics. She told the police officers that one of the offenders had curly hair and that the other had an Afro-like hairdo which was pushed back. She denied saying that the offenders might be white males and did not remember telling the officers that the offenders were 19 or 20 years old. Ann Marie stated at trial that the offenders were in their thirties.

Ann Marie further testified that, on the night of the shooting, she was brought to the police station and was told to look into a room where the offenders were present. When she looked into the room she did not see

the offenders but she saw two Caucasian men, who she thought were plainclothes police officers, sitting at a desk. She could not see the entire room. Ann Marie did not make any identifications of the defendants until the preliminary hearing. While at the station, she observed a light green Nova with bullet holes in the door and stated that that car was similar to the one the offenders had driven.

On cross-examination, Ann Marie said she first saw the Nova automobile when it was two blocks to the west. She admitted that at the preliminary hearing she testified that she first saw the car when it was in front of the Barmes house. She did not remember stating at the preliminary hearing that the car was parked when she first observed it. Ann Marie also admitted that at the preliminary hearing she said she could see the faces of the car occupants when the car was stopped in front of the house.

David Ryan, a tactical officer for the Chicago Police Department, testified that on October 10, 1976, at about 7:50 p.m., he responded to a radio call that a girl had been shot on the southwest corner of 52d Street and Bishop. Based on what he had been told by the people at the scene, he sent a radio message regarding a gold colored Nova containing two male Puerto Ricans that was southbound from 5200 South Bishop.

Officer Jerry Katauskas of the Chicago Police Department Special Operations Group testified that at about 7:50 p.m., on October 10, 1976, he and his partner were patrolling an area approximately nine blocks from 5200 South Bishop. They heard the radio call and subsequently observed a vehicle fitting the description travelling southbound on Ashland Avenue. After the vehicle pulled to the curb, at 5504 South Ashland Avenue, Officer Katauskas and his partner approached the occupants. Officer Katauskas identified defendant Trinidad as the driver of the car and defendant Torres as the passenger. A gun holster was observed on the center hump of the Nova's floor between the passenger's seat and the driver's seat. Officer Katauskas searched the Nova and discovered a loaded .32-caliber semiautomatic handgun under the dashboard on the extreme left side. The defendants were arrested. Officer Katauskas testified that he believed he and his partner took the defendants and the handgun to the tactical office for processing. He stated that he did not see Ann Marie Zellinski in the tactical office that night. Officer Katauskas also testified that other policemen, including some in plain clothes, were present in the office and that, from where he was sitting, the doorway to the room could not be seen in its entirety.

Officer Louis Velez of the Chicago Police Department testified that at about 8 p.m. on October 10, 1976, he arrived at 55th and Ashland and spoke to Officer Katauskas. He then approached the defendants and, in Spanish, informed them of the reason for their detention. Velez stated

that he handcuffed the defendants and placed them in the rear of his vehicle and took them to the police station. While in the police car, defendant Trinidad told Velez that the Nova and handgun belonged to him and that the gun had been test fired earlier that evening in the back of his store.

Officer Joseph Garofalo of the Chicago Police Department testified that on October 10, 1976, he and his partner responded to a call at 5200 South Bishop. He remained at the scene for approximately ten minutes and then toured the area. Later that evening he took Ann Marie Zellinski and her mother to the police station to view the defendants. Ann Marie went to the door of the tactical office, looked into the room and did not recognize anyone. Garofalo testified that he stood next to her and could not see the entire office. Garofalo did not know the identity of the two Caucasian men sitting at the desk in the room.

On cross-examination, Garofalo testified that Ann Marie described the occupants of the Nova as being two male Puerto Ricans and that she did not give a description of the offenders' hair. He admitted that the report he prepared indicated that Ann Marie said the offenders were either 19 or 20 years of age.

Sergeant Donald Smith of the firearms identification section, criminalistics division of the Chicago Police Department, testified that he examined a .32-caliber bullet recovered from Marie Barmes' leg and that he made a microscopic comparison of that bullet with bullets that had been test fired from the .32-caliber semiautomatic gun that had been recovered by the police from the Nova automobile. Smith concluded that the bullet recovered from Marie Barmes' leg was fired from the .32-caliber gun.

On cross-examination, Smith testified that he did not perform certain comparative tests described by defendants' counsel. He also stated that his written report regarding the instant case listed class but not individual characteristic similarities between the test fired bullets and the bullet recovered from Barmes' leg.

At the close of the State's case, the parties stipulated that defendant Trinidad was 38 years old and defendant Torres was 52 years old.

As a defense witness, Investigator Raymond Latimer of the Chicago Police Department testified that he prepared a report regarding the shooting of Marie Barmes. The report described the offenders as "two unknown male white or male Puerto Ricans." This report was written before Latimer interviewed Ann Marie and was based upon descriptions given to Latimer by another police officer. Latimer denied telling the defense attorneys before trial that Ann Marie had given this description to him. Latimer further testified that he spoke to Ann Marie several weeks after the incident and that she said the offenders were two male Puerto

Ricans. She also told Latimer that she had been taken to the police station to view two suspects but that she did not see the men who shot Barmes.

John Sternquist testified that he lived two blocks from the Barmes house. He did not know Ann Marie Zellinski and he did not own and had never driven a Nova in the vicinity of 52d Street and Bishop. On cross-examination, he testified that during October of 1976 he had driven a blue Nova approximately 20 times in the vicinity of 1440 West 34th Street where he worked.

The final defense witness was Clayton Sims. Sims testified that he lived on the 5200 block of South Ashland during October of 1976. He did not know Ann Marie Zellinski and did not own a Nova or drive in the area of 52d Street and Bishop. None of his family or friends owned Novas.

At the conclusion of the trial, the court found both defendants guilty of reckless conduct.

# I
## A.

On appeal, the defendants initially argue that they were not proven guilty beyond a reasonable doubt of the offense of reckless conduct. The defendants base this contention on alleged inconsistencies in the testimony of Ann Marie Zellinski and Officer Louis Velez and on the weak ballistics testimony of Sergeant Donald Smith.

The defendants first contend that Ann Marie's testimony and identifications were improbable and unsatisfactory because of inconsistencies as to when she first saw the Nova, when she observed its occupants, her description of the occupants, and who she knew who drove Novas. The defendants further contend that Officer Velez' testimony was doubtful because it conflicted with the testimony of Officer Katauskas as to who transported the defendants to the police station after their arrest and because Velez did not make out a police report concerning defendant Trinidad's alleged statements.[1]

■■ Where evidence conflicts in a bench trial, it is the province of the trial judge to determine the credibility of the witnesses and the weight to be afforded their testimony and to resolve the inconsistencies and conflicts therein. (*E.g., People v. Pagan* (1972), 52 Ill. 2d 525, 288 N.E.2d 102; *People v. Cozzi* (1981), 93 Ill. App. 3d 94, 416 N.E.2d 1192.) A conviction based upon this determination must be accepted by the reviewing court unless the evidence is so improbable as to raise a reasonable doubt of guilt. *E.g., People v. Jones* (1981), 93 Ill. App. 3d 475, 417 N.E.2d 647.

---

[1] On cross-examination, Officer Velez testified that he did not make a report concerning Trinidad's statements but that he did inform other police personnel of the substance of the statements.

■■ We have reviewed the evidence in the case at bar and find that the conflicts in testimony outlined by the defendants do not raise a reasonable doubt of their guilt. The defendants were convicted based upon the testimony of Ann Marie Zellinski, including her identifications of the defendants, and upon circumstantial evidence. While Ann Marie's testimony was subject to impeachment, it was persuasively corroborated by other evidence. (See *People v. White* (1978), 69 Ill. App. 3d 830, 387 N.E.2d 728, *cert. denied* (1980), 444 U.S. 1090, 62 L. Ed. 2d 778, 100 S. Ct. 1054.) Immediately after the shooting, the defendants were apprehended while driving a vehicle that fit Ann Marie's description. Inside the car was the gun that was later identified as the weapon used to shoot Marie Barmes. We believe that the defendants' convictions were supported by the weight of the testimony at trial.

■■ We also reject the defendants' contention that Sergeant Smith's ballistics testimony was questionable because Smith's determination was based upon a comparison of bullets using his naked eye, because he did not produce photographs of the bullets so that the trial judge could make his own evaluation of that evidence, because he did not make a comparison of the bullets' casings and because his report did not contain a list of the individual characteristic similarities of the test fired and recovered bullets. Although Sergeant Smith did not perform certain comparative tests described by defendants' counsel, we find his testimony credible. Based upon Smith's knowledge and experience, and upon the testing he did conduct, he concluded that the bullet recovered from Marie Barmes' leg was shot from the weapon found in the car occupied by the defendants. The defendants have not shown that Smith's conclusion was premised on inaccurate or questionable testing methods. While additional tests could have been performed by Smith, we find that his credibility was not impeached because he did not do them.

### B.

The defendants also assert that the evidence was insufficient to prove each of them guilty beyond a reasonable doubt under the accountability theory. In the context of this argument, both defendants assume that Trinidad drove the Nova and Torres was the passenger. Each assumes that the other shot Marie Barmes.

At the outset, we feel it necessary to note that the trial judge did not determine which defendant did the shooting. Such a determination was not necessary, however. (See *People v. McClindon* (1973), 54 Ill. 2d 546, 301 N.E.2d 290, *cert. denied* (1974), 415 U.S. 992, 39 L. Ed. 2d 889, 94 S. Ct. 1593.) Both reckless conduct convictions can be upheld if it can be shown that the defendants shared a conscious disregard of the substantial

and unjustified risk of harm to Barmes. Ill. Rev. Stat. 1975, ch. 38, pars. 4—6, 12—5; see *People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898 (involuntary manslaughter).

To be accountable for the acts of another, one must have a specific intent to promote or facilitate the commission of a crime. (Ill. Rev. Stat. 1975, ch. 38, par. 5—2.) Such an intent can be proved by evidence that the defendant shared the criminal intent of the principal or that there was a community of unlawful purpose. The latter is shown by prior deliberation to commit the specific offense or by the spontaneous and combined participation of a group in the perpetration of the offense. (*People v. Bolden*; see *People v. Richardson* (1965), 32 Ill. 2d 472, 207 N.E.2d 478, *cert. denied* (1966), 384 U.S. 1021, 16 L. Ed. 2d 1023, 86 S. Ct. 1935.) Mere presence or negative acquiescence are insufficient to prove guilt. However, one may aid or abet without actively participating in the overt act; and if proof shows he was present at the crime without disapproving or opposing it, this conduct together with other circumstances can be considered by the trier of fact in concluding that such person assented to the criminal act, lent his countenance and approval and was thereby aiding and abetting the crime. (*People v. Nugara* (1968), 39 Ill. 2d 482, 236 N.E.2d 693, *cert. denied* (1968), 393 U.S. 925, 21 L. Ed. 2d 261, 89 S. Ct. 257; *People v. Clark* (1963), 30 Ill. 2d 67, 195 N.E.2d 157; *People v. Bartlett* (1980), 91 Ill. App. 3d 138, 414 N.E.2d 253.) Similarly, a close affiliation with the co-defendants after the commission of the crime, and a failure to report the incident is relevant to establishing accountability. *People v. Lopez* (1979), 72 Ill. App. 3d 713, 391 N.E.2d 105.

The defendants in the instant case argue that their mere presence at the scene of the crime and subsequent flight are not sufficient proof of guilt under the accountability theory. Both defendants rely on the spontaneous way in which the shooting allegedly occurred and contend, therefore, that the State did not establish that they had knowledge of the shooting before it occurred or that they aided in its planning or commission.

We disagree. Relying on facts assumed by the defendants, we believe that there was sufficient evidence to conclude that both defendants participated in the shooting of Marie Barmes and were thus accountable for that crime. Assuming Torres shot Barmes, the evidence shows that Trinidad drove the Nova to the curb and stopped the car. The evidence also shows that, after the shooting, laughter was heard coming from both occupants of the car. Thus, as Trinidad was present at the scene of the crime and obviously did not disapprove of or oppose the shooting, the trial court could properly conclude that he aided and abetted the crime by assenting to the criminal act and lending his countenance and approval. *People v. Nugara; People v. Clark*.

■■ Similarly, assuming Trinidad shot Marie Barmes, Torres would be accountable for the criminal act. Trinidad would have had to reach across the passenger side of the car with the gun. Torres would have had to position himself to avoid the bullet and to give Trinidad access to the window and an unobstructed view of the area. Again we note that both occupants laughed after the shooting occurred. Thus, there was ample evidence to show that Torres aided and abetted the crime by creating conducive conditions and by failing to oppose or prevent its occurrence. For these reasons, the defendants were convicted of reckless conduct beyond a reasonable doubt.

## II

The second issue raised by the defendants on appeal is that the trial judge erred in denying their motion to suppress Ann Marie's in-court identifications of them. The defendants contend that these identifications were tainted by suggestive pretrial show-up procedures at the police station on the night of the defendants' arrest and at the preliminary hearing.

■■ Ann Marie testified at trial that she did not make any identifications at the police station because she did not see the offenders in the tactical office. The defendants question the truthfulness of this assertion. We note, however, that the testimony of Officers Garofalo and Katauskas supports Ann Marie's testimony in this regard. Thus, as Ann Marie did not see the defendants at that time, we cannot say that her in-court identifications of them should have been suppressed because of that alleged suggestive viewing of the defendants at the police station.

The defendants also contend that the preliminary hearing identifications were made under suggestive conditions so as to deny them their right to a fair trial. The suggestive nature of a preliminary hearing identification was recognized in *Moore v. Illinois* (1977), 434 U.S. 220, 54 L. Ed. 2d 424, 98 S. Ct. 458. The court in *Moore* stated in a footnote that counsel for the defendant could have prevented some or all of the suggestiveness of the corporeal identification by requesting that the hearing be postponed until a lineup could be arranged,[2] or by asking that the occurrence witness be excused from the courtroom while the charges were read and the evidence against the defendant recited, and by asking that the defendant be seated with other people in the courtroom when the occurrence witness attempted an identification.

---

[2] The granting of a request by the defendant for a lineup at a preliminary hearing is discretionary. Some relevant factors are the length of time between the crime or arrest and the request, the possibility that the defendant may have altered his appearance, the extent of inconvenience to prosecution witnesses, the possibility that revealing the identity of the prosecution witnesses would subject them to intimidation, the propriety of other identification procedures used by the prosecution, and the degree of doubt concerning the identification. *United States v. Ravich* (2d Cir. 1970), 421 F.2d 1196.

Identifications of defendants at preliminary hearings have been distinguished from police identification procedures because during the former the identification witnesses are not present merely to observe and identify the defendants. Rather, the witnesses are present to testify for the State and are available for cross-examination by defense counsel as to the strength of the identification. Recognizing this distinction, the court in *United States ex rel. Riffert v. Rundle* (3d Cir. 1972), 464 F.2d 1348, *cert. denied* (1974), 415 U.S. 927, 39 L. Ed. 2d 484, 94 S. Ct. 1434, held that the defendant therein was not denied due process when he was identified at the preliminary hearing even though the State's witnesses saw him being led into the courtroom handcuffed and accompanied by two policemen and his attorney.

In the case at bar, the motion of the defense counsel to exclude witnesses from the courtroom during the preliminary hearing was granted. When Ann Marie identified the defendants, ample opportunity was given to defendants' counsel to cross-examine her as to her identifications. The defendants' counsel did not request a lineup, and the record does not indicate where the defendants sat during the preliminary hearing.

In a similar factual situation, the court in *Haberstroh v. Montanye* (2d Cir. 1974), 493 F.2d 483, rejected the defendant's argument that the preliminary hearing identification was objectionable. In *Haberstroh*, defendant's counsel neither objected to the preliminary hearing identification nor requested a lineup. Counsel did closely cross-examine the witness at the hearing. Based on the witness' close-range observation of the defendant at the time of the crime together with corroborative evidence, the court concluded that there was no substantial likelihood of misidentification.

In the instant case, Ann Marie testified that she viewed the defendants for 10 seconds as the car passed by her and turned the corner to travel south on Bishop. Her observation of the defendants at this time, together with the strong corroborative evidence, leads us to a conclusion that there was no substantial likelihood of misidentification. Thus the identifications were properly admitted and there was no denial of due process. The alleged suggestiveness of the identification procedures would merely affect the weight of the identification testimony. (*People v. Nolden* (1980), 91 Ill. App. 3d 532, 414 N.E.2d 1124.) Here the trier of fact chose to believe the State's evidence, and we find no reason to reverse that determination.

### III

As their final argument on appeal, the defendants argue that the sentences imposed upon them were excessive. The defendants were given the maximum imprisonment term and contend that the trial judge did not

consider mitigating factors as required by section 5—5—3.1 of the Unified Code of Corrections (Ill. Rev. Stat., 1977 Supp., ch. 38, par. 1005—5—3.1).

It is undisputed that at the time of sentencing defendant Trinidad was the sole supporter of his wife and child, had a regular job and had one prior conviction for a minor offense. Defendant Torres had no criminal record and had worked at the same job for 25 years. He was 51 years old[3] and was on leave from his job due to a diabetic condition.

■■ A trial court's decision in regard to sentencing is entitled to great deference and weight because the trial judge has had an opportunity to observe and consider many factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) When sentencing a defendant, the trial judge must balance the protection of society and the possible rehabilitation of the offender. (*People v. Belcher* (1980), 92 Ill. App. 3d 237, 415 N.E.2d 1120.) It is not the function of reviewing courts to serve as sentencing courts, and they cannot substitute their judgment for that of the trial judge merely because they would have balanced the appropriate factors differently. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) Absent an abuse of discretion, the trial court's sentence will not be altered on review. *People v. Perruquet.*

■■ Defendant Torres relies on *People v. Blumstengel* (1978), 61 Ill. App. 3d 1016, 378 N.E.2d 401, to argue that the imposition of the prison sentence was an abuse of discretion. *Blumstengel* is distinguishable, however, because in that case the trial judge failed to consider the gravity of the offense or the defendant's prior criminal record. The trial judge in the case at bar did consider the seriousness of the offense as a factor in aggravation. (See Ill. Rev. Stat., 1977 Supp., ch. 38, par. 1005—5—3.2.) It was for that reason that the trial judge imposed the imprisonment sentences for both defendants. We cannot say that the imposition of such sentences for the senseless shooting of a 12-year-old child by two mature adults is an abuse of discretion.

For the foregoing reasons, the judgments of the circuit court of Cook County are affirmed.

Affirmed.

RIZZI, P. J., and McNAMARA, J., concur.

---

[3] Although it was stipulated at trial that Torres was 52 years old, the presentencing report and Torres' counsel indicated at the sentencing hearing that Torres was 51 years old.