THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIE McBOUNDS *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 1—86—0369

Opinion filed February 22, 1989.

Mary Ellen Dienes, of Chicago, for appellant Willie McBounds.

Steven Clark and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant Fred Edwards.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Theodore F. Burtzos, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendants Willie Earl McBounds and Fred Edwards were convicted of the murder of Ricardo Wright. Defendant McBounds was sentenced to the Illinois Department of Corrections for a term of 38 years, and defendant Edwards was sentenced to a term of 28 years. On appeal, defendant McBounds contends that: (1) the statute under which the only evidence of defendant's guilt was admitted is an unconstitutional legislative encroachment on the rulemaking power of the judiciary; (2) he was denied his constitutional right to confrontation of witnesses against him by the State's use of the prior inconsistent statements of two prosecution witnesses; (3) he was not proved guilty beyond a reasonable doubt where the only evidence against him was untrustworthy; and (4) he was denied a fair trial by the prosecution's improper arguments. Defendant Edwards contends that: (1) the State failed to prove him guilty of murder beyond a reasonable doubt; (2) he was denied his constitutional right to present a defense by the trial judge's failure to enforce subpoenas for two critical defense witnesses; (3) the State's impeachment of two witnesses with their prior inconsistent statements was improper under Supreme Court Rule 238 (107 Ill. 2d R. 238) and deprived defendant Edwards of his right to a fair trial; (4) section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1) violates both the Illinois and United States Constitutions; (5) he was denied a fair trial by the prosecutor's improper statements during rebuttal and closing argument; (6) the trial court violated his right to due process by considering his protestation of innocence as a lack of remorse and using it as an aggravating factor in sentencing; (7) his 28-year sentence was excessive in view of his rehabilitative potential; and (8) the trial court acted improperly in allowing the use of prior inconsistent statements of two prosecution witnesses as substantive evidence without a determination of the voluntariness of the statements.

The trial began with the testimony of Frances Poston, the victim's mother, who stated that on July 14, 1985, sometime after 11 p.m. she received a telephone call from defendant McBounds stating

that he was not at home, but that he had just heard that her son had been killed and would visit her the next day. Poston stated that defendant McBounds and her son were good friends, and she knew of no problems between them prior to the shooting.

Valerie Barnes, the victim's common law wife, testified that the victim came to her house at around 9:15 p.m. on the night of the shooting and remained there for 20 minutes while his friend Anthony Moore stayed outside in a car. Sometime later Barnes learned that the victim had been shot.

Anthony Moore was the next witness called by the State. Moore was accompanied by his attorney, Steven Stern. Moore claimed that his prior statements to the police and grand jury had been coerced and that he intended to testify contrary to his former statements. Stern stated that Moore would not testify unless he was granted immunity from perjury. The trial judge advised Moore that a grant of immunity would not cover a charge of perjury and that he would be held in contempt of court if he refused to testify. Moore then testified that on the evening of July 14, 1985, he met the victim and they went to Marilyn Rice's house. While the victim stayed in front of the house, Moore went to the back of the house and fell asleep. Moore stated that the next thing he remembered was Kenny Rice waking him up and telling him that the victim had been shot. Moore went to the front of the house and saw the victim in a pool of blood. After an unsuccessful resuscitation attempt, Moore stated that he went home and informed the victim's brother of the shooting.

Several days later Moore was taken to the police station. He claimed that he was detained for 23 hours, handcuffed to a wall, denied food or the use of a bathroom and was beaten and kicked in the groin, back and legs. Moore claimed that the police also threatened to tell defendants that Moore had given them a statement against them. The police allowed him to leave only after he signed a statement which the police directed him to make. Following this experience, Moore contacted the State's Attorney's office to complain about his treatment at the police station, but his call was never returned.

In his statement to the police, Moore said that on the day of the murder he was talking with the victim in the parking lot by the Rice's house when defendant Edwards called the victim to the area in front of the porch and started arguing with him. Moore overheard Edwards say something about drugs and money and tell the victim that he "blew it." Defendant McBounds then walked up behind defendant Edwards, and as Edwards moved away, the victim also turned to move away but was shot in the back of the head by defendant McBounds.

Moore was later subpoenaed to testify before the grand jury. Prior to his testimony, he was directed to go to the State's Attorney's office. Moore stated that when he arrived, Assistant State's Attorney Beuke left, and Officers Digman and McGuire, who were also present, then hit him in the face and head with a golf club and told him to "put the case on" defendants. Moore stated that his face was red and swollen when he was taken to the grand jury room to testify. He did not tell any member of the State's Attorney's office or grand jurors that he had been beaten, and he testified to facts similar to those in his earlier statement.

Gerald King, the nephew of the victim, was the next witness to testify. He stated that on the day of the shooting, he borrowed the victim's car and drove around Altgeld Gardens, where he saw both defendants shortly before returning the car at 8:30 p.m. King did not report seeing either defendant in Altgeld Gardens to the police or State's Attorney's office until he was questioned shortly before the commencement of trial. He also acknowledged talking to Angela Parker, but denied telling her that he would lie to put defendants in jail.

Anthony King was also the victim's nephew. He testified that about 3:30 p.m. the day after the shooting, he was out with the victim's daughter, Tasha Barnes, when he saw defendant Edwards with a group of men. When Edwards saw them, he pointed and said "[A]in't that the man's daughter that we killed last night?" King and Barnes left and reported the incident to their parents.

The State's last witness was Rozena Petty. She stated that on the evening of July 13, 1985, she and the victim drove to the forest preserve, drank beer and talked. She was with the victim until 10:30 a.m. the next day, when he brought her home. She went to sleep at 2 p.m. and was awakened by her daughter, who told her that the victim had been shot.

Sometime after the shooting, the police asked Petty to give them a statement. She stated that she was drunk when she was taken to the police station at 9 p.m. and that the police kept her at the station until 11:30 a.m. the next day. Petty testified that she only signed the statement because the police would not allow her to go home to her one-year-old twins, who were unattended, until she signed it. In the statement Petty told the police that she was with the victim at the Rices' house on the evening of July 14, 1985, and that she heard three shots and saw defendant McBounds with a gun. Petty also stated that defendant Edwards was at the scene of the shooting. In her trial testimony, Petty contradicted Gerald King's testimony that

he had borrowed the victim's car on the day of the shooting. Petty claimed that the victim would not have allowed anyone else to drive it.

Marva Whitfield testified for the defense that she had known defendant Edwards for more than five years and that he was at her house on the night of the shooting. She stated that defendant received three telephone calls at her house that night; two calls were from his nephew Howard Foreman and one was from Eddie Hudson. All three calls were initially answered by her. She also testified that she and defendant were at her house the entire day, that her car was in front of her house with a flat tire, and that defendant and the victim had been good friends.

Howard Foreman testified that on the night in question he called defendant at Marva Whitfield's house at around 10:10 p.m. to arrange for a ride home. Foreman stated that defendant Edwards answered the phone. According to Foreman, defendant stated that he could not give Foreman a ride because Whitfield had used his car to drive to her mother's house and was not at home. Foreman stated that he called defendant two more times and was told each time that Whitfield had not returned home. Foreman also testified that it was defendant who initially responded to each of his calls.

Dorothy Foreman, defendant Edwards' sister, testified and corroborated Howard Foreman's testimony regarding the telephone calls to defendant. Quintana Cage was the next defense witness to testify. She knew defendant McBounds through her mother, Diane Cage Edinburg, who was defendant McBounds' girlfriend. She also stated that she had known the victim because he was a friend of defendant McBounds. Quintana Cage stated that on the night of July 14, 1985, she saw the victim after he had been shot and she called home and spoke to defendant McBounds.

Sid Williams testified that three weeks before the trial he was with his friend Russell Spikes when Gerald King telephoned and asked to speak to Spikes. Spikes used one of the telephones to talk with King while Williams eavesdropped on their conversation. Williams stated that King asked Spikes to testify that he had seen both defendants in Altgeld Gardens on the day that the victim was shot but Spikes refused.

Kenneth Baker testified that he saw the victim on the morning of July 14, 1985, and that the victim gave his car to Gerald King but asked to have it returned by 8:30 p.m. According to Baker, the victim then went to Marilyn Rice's house and King drove away.

Diane Cage Edinburgh testified that, on the evening of the shoot-

ing, defendant McBounds was home with her the entire evening. Beginning at 10 p.m. she and defendant received several calls informing them of the victim's death, and they subsequently spoke with the victim's mother. Cage also testified that the victim and defendant had been close friends.

Cage stated that she knew Anthony Moore and on one occasion had given him a ride to court. She said that she knew Moore was testifying against defendant McBounds, but that she was not concerned and did not talk with him about the case. Cage also testified that she knew Marilyn Rice, and that at the request of the defense attorney, she had gone to her house to inquire if she needed a ride to court. Cage stated that she thought Rice would be a witness for the prosecution. She also claimed that she had seen Rice in court several times and that on one of these occasions Rice was crying. Angela Parker testified that several weeks earlier Gerald King and Russell Spikes had been at her house and that King said that he would lie in court if he had to in order to get defendants convicted because he did not like them.

Eddie Hudson testified that when he learned that the victim had been shot, he telephoned defendant Edwards at Whitfield's house between 10:05 and 10:10 p.m. Hudson stated that Edwards' girlfriend initially answered the telephone but that he then spoke directly with defendant.

Following Hudson's testimony, defense counsel requested a two-day continuance in order to obtain Marilyn Rice's appearance in court. Defense counsel reported that subpoenas were served on Marilyn Rice and her mother but that her mother was ill, and Marilyn refused to come to court. The court granted the continuance for two days, but defense counsel was still unable to obtain Rice's appearance in court. The State refused to stipulate as to what Rice's testimony would be, and the court refused to allow defense counsel's offer of proof.

Renee Fields testified that between 9 p.m. and 10 p.m. on the date of the shooting, she went to the Rices' home and saw the victim in front of the house talking with a man she did not know. While she was in back of the house, she heard what sounded like two firecrackers. About 10 to 15 minutes later, she went to the front of the house and found the bleeding victim on the ground.

Defendant Edwards testified that he and the victim had been close friends. On the day of the shooting he claimed that he was at Whitfield's house all day, and that except for a few hours in the afternoon, she was with him during that time. Edwards learned of the victim's death through a telephone call he received from Hudson. He

also received three calls from his nephew requesting a ride. Defendant stated that he lied to his nephew about not being able to give him and his mother a ride home because he was tired.

When defendant Edwards was arrested for the victim's murder, he spoke to Assistant State's Attorney Fitzgerald and gave a written statement, which he read and signed. In the statement defendant said that he received a call regarding the victim's death at 11:15 p.m. on the date of the shooting. He also said that the day prior to the shooting he was with defendant McBounds and three other men, and that they were talking about resolving a problem with someone who had taken narcotics from a person called Pearly. Edwards denied both written statements and said that the case against him was fabricated because they wanted to see him go to prison.

Gregory Vonderheide, a special agent for the Federal Bureau of Investigation, testified for the State in rebuttal. He said that he spoke with Anthony Moore regarding Moore's allegations against the police. Moore told Vonderheide that he left the grand jury proceeding at 1:30 p.m., and that he reported to the Roseland Community Hospital at 6:52 p.m. The hospital records indicated that Moore was treated for bruises and that he reported being hit in the head and chest with a golf club.

Dorothy Foreman testified on surrebuttal that testimony was not presented before the grand jury in defendant Edwards' case until 3:30 p.m. on September 5, 1985. She also stated that she saw Moore at 12:30 p.m. that day and he did not appear to be injured. Defense counsel's request to withdraw from the case and testify regarding the time of the grand jury proceeding was denied.

■ On appeal, defendant McBounds contends that section 115—10.1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1) is unconstitutional because it is a legislative encroachment on the rulemaking power of the judiciary. The statute authorizing the use of prior inconsistent statements is constitutional as within legislative authority and the legislature has the power to prescribe methods of proof and alter existing rules of evidence. (*People v. Orange* (1988), 121 Ill. 2d 364, 521 N.E.2d 69; *People v. Hastings* (1987), 161 Ill. App. 3d 714, 515 N.E.2d 260, *appeal denied* (1988), 118 Ill. 2d 547; *People v. Winfield* (1987), 160 Ill. App. 3d 983, 513 N.E.2d 1032, *appeal denied* (1987), 117 Ill. 2d 552.) The fact that the Illinois Supreme Court has not previously allowed the substantive use of prior inconsistent statements did not preclude the legislature from doing so. (*People v. Orange*, 121 Ill. 2d 364, 521 N.E.2d 69.) Contrary to defendant's allegations, the Illinois Supreme Court has affirmed the

legislative enactment of section 115—10.1 and has expressly found that it was not an encroachment on judicial power. The holdings in *People v. Hastings* and *People v. Winfield* have not been rejected by the Illinois Supreme Court as defendant argues, and they are valid law. Therefore, the statute in question is constitutional, and the prior inconsistent statements of Moore and Petty were admissible as substantive evidence.

Defendant Edwards has also challenged the constitutionality of this statute, and based on *People v. Orange* and our discussion above, we conclude that the statute under which the prior inconsistent statements in question were admitted is constitutional.

■ Defendant McBounds next contends that he was denied his constitutional right to confront adverse witnesses where the only evidence against him was the prior inconsistent statements of two witnesses. Defendant contends that he was unable to confront the two witnesses regarding their prior inconsistent statements because the witnesses either could not remember or denied making the prior statements. However, the United States Supreme Court has held that the confrontation clause of the sixth amendment is not violated by the admission of a witness' prior inconsistent statements as substantive evidence as long as the witness is testifying at trial and is subject to cross-examination. *California v. Green* (1970), 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930.

The Court chose, however, not to decide the issue of whether a witness' alleged lapse of memory would make a critical difference in the application of the confrontation clause and deferred the determination of this issue back to the State courts, concluding that the resolution of this issue would depend on the unique facts of each case. (*California v. Green*, 399 U.S. at 170, 26 L. Ed. 2d at 503-04, 90 S. Ct. at 1941.) The court in *United States v. DiCaro* (7th Cir. 1985), 772 F.2d 1314, stated that a determination of how much a witness' memory lapse hampers cross-examination turns on the degree to which the witness' memory lapse affects the ability of the trier of fact to determine the veracity of the out-of-court statements.

In the instant case, it was the judge, as the trier of fact, who heard the testimony and out-of-court statements of Anthony Moore and Rozena Petty. Although defendant McBounds contends that his cross-examination of these witnesses was hampered by their denial or inability to recall their previous out-of-court statements, the evidence reflects otherwise. During his trial testimony, Moore acknowledged making a statement to the police that he was with the victim at the Rices' house at the time of the shooting, but that he fell asleep and

saw nothing. Moore then described how he was brought back to the police station, and that rather than ask him questions, the police told him what he had seen. Moore then claimed that he was detained for 23 hours, handcuffed to a wall without any bathroom facilities or nourishment. He was then given what was represented as his written statement to the police. Moore testified that he read the statement, made changes and signed it, but that none of the contents of the statements were his words except the changes he made. Moore also acknowledged testifying before the grand jury, and although he initially claimed that he was just saying anything "to get out of there," he then acknowledged his prior testimony at the trial. Moore recalled testifying that he saw both defendants at the Rice house, that defendant Edwards spoke to the victim, and that defendant McBounds pulled a gun and fired it. Moore then recalled testifying that defendant McBounds caught up with defendant Edwards who had already started running from the scene. Moore also recalled telling the grand jury that he pretended to be asleep after the victim was shot. On cross-examination Moore did not claim any memory loss or deny making the statements in question but described in detail how he was physically abused and coerced into making them.

Rozena Petty also testified on direct examination that she gave a statement to the police. However, she stated that what was represented to her as her statement in writing was not what she had previously told police. Petty also testified that she read the statement and signed it. On cross-examination, Petty stated that her previous out-of-court statement was not true and that she had only signed it because she had been ill due to her drinking and also because the police would not allow her to go home to her one-year-old twins, who were unattended, until she did.

██ Both Moore and Petty were hostile witnesses for the State. Neither witness had any significant memory lapse either on direct or cross-examination and neither witness denied anything but the truth of their prior statements. Furthermore, during cross-examination both witnesses testified extensively as to the reasons for the inconsistencies in their trial testimony and prior statements. Therefore, we conclude that both witnesses' recollections and acknowledgements of their prior statements did not hamper defendant's right to confront or cross-examine witnesses against him.

██ Defendant McBounds also contends that the confrontation clause was violated by the admission of witnesses' out-of-court statements not made under oath. Where a witness testifies under oath regarding his prior statements and is available for cross-examination

with respect to both past and present versions of the event, the prior statements are equally admissible as far as the confrontation clause is concerned whether or not they were made under oath. (*California v. Green*, 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930.) Under section 115—10.1 of the Code of Criminal Procedure, statements not made under oath are admissible if they narrate, describe or explain an event or condition of which the witness had personal knowledge and the statements comply with subsections (c)(2)(A), (c)(2)(B) or (c)(2)(C). Ill. Rev. Stat. 1985, ch. 38, pars. 115—10.1(c)(2)(A), (c)(2)(B), (c)(2)(C).

■ In the instant case, both Moore's and Petty's signed statements were admissible pursuant to section 115—10.1 (Ill. Rev. Stat. 1985, ch. 38, pars. 115—10.1(a), (b), (c)(2)(A).) Both written statements described events of which the witnesses allegedly had personal knowledge, and each witness testified at trial that he read the statements, made changes and signed them. In addition, Moore's signed statement was corroborated by his testimony under oath before the grand jury.

The last issue raised by defendant McBounds regarding the confrontation clause is that it does not permit the use of statements as evidence against a defendant where the statements were the involuntary product of coercion and violence. Moore testified at the trial that he signed the statement in question because he was handcuffed and detained overnight at the police station and beaten with a small stick. Moore did not seek medical attention following the alleged abusive treatment at the police station, but testified that he sought help from the State's Attorney's office and civil rights organizations. Moore also stated that shortly prior to his testimony before the grand jury the police beat him on the head and face with a golf club and told him how he was to testify. Moore also stated that he sought treatment at Roseland Community Hospital after he testified. Moore's responses to the prosecutor's questions as to the time of his grand jury appearance were vague but he said that it was late in the afternoon.

The State, on rebuttal, presented the testimony of Gregory Vonderheide, an investigator for the Federal Bureau of Investigation. Vonderheide stated that he worked in the unit to which claims of police brutality were directed and that he had been assigned to investigate Moore's complaints of the alleged mistreatment he received. Vonderheide also testified that the Roseland Community Hospital record disclosed that Moore had sought treatment at 6:52 p.m. on the date of his grand jury appearance, that he had suffered some bruises and that he was treated with Tylenol. Vonderheide also testified that Moore informed him that he left the grand jury at 1:30 p.m. According to Vonderheide's testimony, an investigation of Moore's allegations was con-

ducted, no police officers were indicted, and at the time of trial, the investigation was closed.

Petty also testified that her prior statement to the police regarding the shooting was coerced and involuntary, and that she had only signed the statement claiming that she did not know what she was doing because of her drinking the night before. Petty also claimed that the police had detained her overnight and would not allow her to return home to her young unattended children until she signed the statement.

■■ The trial judge considered the witnesses' prior statements as well as their trial testimony regarding their allegations of abuse. The trial judge also heard the testimony of Investigator Vonderheide that Moore's allegations had been investigated and that no evidence was found to support them. We conclude that there was sufficient evidence to support the trial court's finding that the witnesses' prior statements were not coerced and were voluntary, and that no further inquiry was needed.

Defendant Edwards has also raised this issue. We have considered his arguments, and for the same reasons, we conclude that there was sufficient evidence to support the trial court's finding that the statements in question were voluntary.

■■ Defendant McBounds next contends that he was not proven guilty beyond a reasonable doubt where the only evidence against him was untrustworthy. The trier of fact must determine the credibility of the witnesses and the weight to be given their testimony, and where the evidence is merely conflicting, a reviewing court will not substitute its judgment for that of the trier of fact. A trial court's finding will only be set aside if the evidence, when viewed in a light most favorable to the prosecution, is such that no rational trier of fact could have found defendant guilty beyond a reasonable doubt. *People v. Linscott* (1986), 114 Ill. 2d 340, 500 N.E.2d 420; *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267; *People v. Lester* (1981), 102 Ill. App. 3d 761, 430 N.E.2d 358.

■■ In the instant case, the trial court heard the testimony of several State's witnesses and 12 witnesses, including defendant Edwards, for the defense. Although there were two witnesses who presented alibi testimony for both defendants that neither was in Altgeld Gardens on the day of the shooting, Gerald King, the nephew of the victim, testified that he saw both defendants in Altgeld Gardens that evening. The trial judge considered the testimony of all the witnesses, including Moore and Petty, whose out-of-court statements he found more trustworthy than their trial testimony, and he concluded that

there was sufficient evidence to find defendant guilty beyond a reasonable doubt. Therefore, viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have made the same finding.

Defendant McBounds' last contention is that he was denied a fair trial because the prosecutor presented improper arguments before the court which were unsupported and contradicted by the evidence presented. Defendant claims that the prosecutors made improper comments that Moore and Petty testified contrary to their out-of-court statements because they were afraid of defendants. Defendant also claimed that the prosecutor misstated the evidence when he argued that there was no evidence that the police coerced Moore and Petty into making their out-of-court statements. Defendant argues that the prosecutor's comment that the police were not investigating either defendant and had no reason to force Moore and Petty to provide evidence against them was improper and contrary to evidence because there was evidence that defendants were suspects prior to Moore's and Petty's statements.

■ ■ A prosecutor is allowed a great deal of latitude in making his closing argument, and the trial court's determination of the propriety of the argument will be followed absent a clear abuse of discretion. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 514 N.E.2d 970; *People v. Neumann* (1986), 148 Ill. App. 3d 362, 499 N.E.2d 487.) To constitute reversible error the complained-of remarks must have resulted in substantial prejudice to the accused so that absent these remarks the verdict would have been different. (*People v. Morgan* (1986), 112 Ill. 2d 111, 492 N.E.2d 1303.) Where there are allegations of prosecutorial misconduct, the arguments of both the prosecutor and defense counsel must be examined in their entirety, and the complained-of comments must be placed in their proper context. *People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174.

In the instant case, the prosecutor's comment that Moore and Petty contradicted their former statements because they were fearful of defendants could be inferred from the fact that their trial testimony and former statements were inconsistent, their testimony in defendants' presence was favorable to them and both witnesses had contact with several people who testified for the defense.

The other argument of the prosecutor, which defense counsel claimed was improper, was the prosecutor's reference to the fact that the police had no reason to coerce Moore and Petty into making statements against defendants because they were not suspects at the time Moore and Petty met with the police. Whether or not the prosecutor

was correct about when defendants became suspects, there was other evidence to support the same contention of the State, such as Vonderheide's testimony that he found no evidence of Moore's allegations of abuse.

██ The trial judge had an opportunity to hear the testimony and observe the demeanor of over 15 witnesses to determine whether Moore or Petty had been intimidated by defendant or the police and which of their contradictory statements were most credible. Therefore, we conclude that the prosecutorial arguments were not prejudicial to the defense, and that absent these remarks, the trial court's finding would still have been the same. *People v. Cisewski*, 118 Ill. 2d 163, 514 N.E.2d 970.

Defendant Edwards has also raised this issue, and based on our discussion above and the authorities cited, we reach the same conclusion.

██ Defendant Edwards contends that the State failed to prove him guilty of murder based on accountability. The trier of fact must determine the credibility of the witnesses and the weight to be given their testimony, and to resolve inconsistencies and conflicts therein. Therefore, where the evidence is only conflicting, a reviewing court will not substitute its judgment for the trier of fact. (*People v. Torres* (1981), 100 Ill. App. 3d 931, 427 N.E.2d 329.) In addition, guilt by accountability is governed by section 5—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 5—2). To sustain a conviction on an accountability theory, the State must establish beyond a reasonable doubt that a defendant solicited, aided, abetted or attempted to aid another in the commission of a crime. (*People v. Deatherage* (1984), 122 Ill. App. 3d 620, 461 N.E.2d 631.) Although mere presence or negative acquiescence is not sufficient to establish guilt by accountability, an accused may be found to have aided or abetted the commission of a crime based on his presence at the scene in addition to his acts after its commission. *People v. Bunting* (1982), 104 Ill. App. 3d 291, 432 N.E.2d 950; *People v. Tate* (1976), 63 Ill. 2d 105, 345 N.E.2d 480.

The trial judge in the instant case found the pretrial statements of Moore and Petty more credible than their testimony at trial. Petty's prior statement placed both defendants at the scene of the shooting, and Moore's statement and grand jury testimony stated that defendant Edwards called the victim over to where he was standing, started talking to him and began to walk away. The victim then turned his back on both defendants and was shot in the back of the head by defendant McBounds. Defendant McBounds then caught up

with defendant Edwards, and they left the scene together. Moore's description of the murder was corroborated by the physical evidence that the victim was shot in the back of the head. Gerald King testified that he saw defendants in Altgeld Gardens sometime between 7:30 and 8:30 p.m. on the night of the shooting, and Anthony King testified that on the day after the shooting, Edwards pointed to the victim's daughter and said, "[A]in't that the man's daughter that we killed last night?"

Although numerous witnesses presented alibi testimony on behalf of both defendants, the testimony contained many inconsistencies and was also contradicted by testimony for the State. In addition, the trial judge had an opportunity to observe the demeanor of the witnesses and to weigh the credibility of their testimony. In considering the evidence as a whole, the judge was convinced that defendant Edwards was guilty of murder on the basis of accountability beyond a reasonable doubt. We conclude that this determination was not improbable, unreasonable, or unsatisfactory, and we will not disturb it. *People v. McNeal* (1987), 160 Ill. App. 3d 796, 513 N.E.2d 897.

Defendant Edwards next contends that he was denied his right to present a defense where the trial court failed to enforce subpoenas for two critical defense witnesses. All motions for a continuance are within the discretionary power of the trial court and will be considered in light of the diligence shown by the movant. (*People v. McNeal*, 160 Ill. App. 3d 796, 513 N.E.2d 897.) Where there is no evidence or expectation that the witness will be available in the foreseeable future, the denial of the motion is proper. *People v. Davis* (1986), 147 Ill. 3d 800, 498 N.E.2d 633.

In the instant case, defendants answered ready and demanded trial as early as October 1985, but neither Marilyn Rice nor her mother was listed among the witnesses that defendants intended to call. The State did list them as witnesses, however, and issued subpoenas for their appearance. The trial began on December 2, 1985, and 10 days later Rice appeared in court. However, she allegedly left in tears before she could testify. On December 17, 1985, defense counsel requested a two-day continuance to subpoena Marilyn Rice and her mother, which the court granted, but when defense counsel was again unsuccessful in bringing the witnesses before the court, the trial judge denied any further continuance. We conclude that where defense counsel had ample opportunity to subpoena both witnesses at an earlier date, failed to do so and was also unable to show the court that further continuances would have any different result than the ones already granted, the trial court's denial of any further continuance was proper.

Defendant Edwards next contends that the trial court violated due process by considering his claim of innocence as demonstrating a lack of remorse and considering this as an aggravating factor in sentencing. He also contends that the 28-year sentence for murder was excessive in light of his rehabilitative potential. Defendant argues that his due process rights were violated by placing a penalty on the exercise of his fifth amendment right to be a witness against himself.

Factors properly considered in sentencing include the accused's credibility, demeanor, general moral character, mentality, social environment, habits and age, and a reasoned judgment as to the proper sentence to be imposed must be based on the particular circumstances in each case. (*People v. Ward* (1986), 113 Ill. 2d 516, 499 N.E.2d 422, *cert. denied* (1987), 479 U.S. 1096, 94 L. Ed. 2d 168, 107 S. Ct. 1314.) A trial judge's impression that a defendant who protests his innocence is lying may properly be considered along with other information about defendant, as well as the particular facts of the case, in order to determine defendant's prospect for rehabilitation and restoration to society. *People v. Ward*, 113 Ill. 2d 516, 499 N.E.2d 422; *People v. Hall* (1987), 159 Ill. App. 3d 1021, 513 N.E.2d 429.

In the instant case, defendant Edwards did claim that he was innocent, and the trial judge did refer to defendant's lack of remorse as one of the factors he considered in determining the sentence. However, the trial judge's assessment of defendant's attitude was not solely based on defendant's claim of innocence at the sentencing hearing. He also considered the evidence presented at the trial, including the testimony of one of the witnesses that defendant had been overheard telling his companions about his participation in the victim's murder. The trial judge also considered the credibility and demeanor of the witnesses, including defendant, who lied during his trial testimony regarding his use of the name David Cage. A defendant's truthfulness, while testifying in his own behalf, has been deemed probative of his attitudes toward society, his prospects for rehabilitation and is relevant to sentencing. (*People v. Ward*, 113 Ill. 2d 516, 499 N.E.2d 422.) Also considered were the factors in mitigation and the presentence investigation report.

The trial judge is in a better position to determine the sentence to be imposed than the reviewing court, and his sentencing decision is entitled to great deference and weight. (*People v. Ward*, 113 Ill. 2d 516, 499 N.E.2d 422; *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Before reversing a sentence imposed by the trial court, it must be clearly evident that the sentence was improper. (*People v. Ward*,

113 Ill. 2d 516, 499 N.E.2d 422.) We conclude that the trial court considered all of the relevant factors and exercised its discretion properly in his determination of defendant's sentence.

Accordingly, the judgment of the circuit court is affirmed.

Judgment affirmed.

FREEMAN, P.J., and McNAMARA, J., concur.